James E. SEYFRIED, Individually and as next friend of Debbie Seyfried, a minor child; Frances L. Taylor, Individually and as next friend of Keith Robert Taylor, a minor child, and Durward Allen Ekas, Individually and as next friend of Deborah Ekas, a minor child, Plaintiffs,

v.

Bruce R. WALTON, Gooden T. Warren, Joshua T. West, Wellford W. Inge and Kenneth LaVere, Individually and as members of the Board of Education of the Caesar Rodney School District, F. Neil Postlethwaite, Individually and as Superintendent of the Caesar Rodney School District, and Caesar Rodney School District, Defendants.

Civ. A. No. 81–117.

United States District Court, D. Delaware.

April 14, 1981.

Ernest S. Wilson, Jr., Wilson & Whittington, Wilmington, Del., and John R. Williams, Morris, Nichols, Arsht & Tunnell, Dover, Del., for plaintiffs.

Nicholas H. Rodriguez, Catherine T. Hickey, Schmittinger & Rodriguez, Dover, Del., for defendants.

## OPINION

STAPLETON, District Judge:

The plaintiffs in this civil rights actions are students who attend a public secondary school and their parents. They contend that their First Amendments rights were violated when the District Superintendent determined that a proposed production of the Broadway musical "Pippin" would be inappropriate as a school sponsored production. The facts relevant to this claim can be briefly stated.

### THE FACTS

Caesar Rodney High School, a ninth through twelfth grade public school located in Dover, Delaware, sponsors a theatrical production each spring. In December of 1980, Mrs. Jocelyn Coverdale, the Director of Theater at the school, selected the musical "Pippin" as the production to be sponsored in the spring of 1981. It was her responsibility to make this selection and she understood, correctly I believe, that the faculty members who had assumed responsibil-

ity for the spring production in the past had not sought approval of their selections from their superiors. Accordingly, she did not seek such approval. Mrs. Coverdale was aware, however, that school administrators from time to time had informally offered guidance to her predecessors about what would be considered appropriate in the way of language and subject matter and what would not. She thought that Pippin, as originally and ordinarily produced, would be inappropriate for a high school production but felt that it could be edited and staged in a way that would make it appropriate.

Try-outs, utilizing two copies of Pippin from the school library, were held on February 23 and 24, 1981. On February 26th rehearsals began and on March 2nd cast copies of the script, rented from the copyright holder, were received at the school and distributed. Mrs. Coverdale told the students when she distributed the scripts that there would be changes which she would give them at a latter date.

Mrs. Coverdale recorded her modifications in her copy of the script and gave these changes to the students on March 9th. By March 6th, however, a parent had read an unmodified script and had complained to Bruce Walton, President of the Board of Trustees of the Caesar Rodney School District, that portions of the play mocked God and prayer. On March 9th, when Mr. Walton next had occasion to confer with the District Superintendent, Dr. Postlethwaite, he relayed this complaint and asked if Postlethwaite were familiar with the proposed production.

Dr. Postlethwaite obtained a copy of the modified script from Mrs. Coverdale and read it at some point between the afternoon of March 9th and the morning of March 11th when he convened the regular weekly meeting of his staff. During that meeting he discussed the proposed production of Pippin with his staff, two of whom had seen productions of the musical. Dr. Postlethwaite concluded on March 11th that the musical, as modified by Mrs. Coverdale, was inappropriate, and directed that it not be given as the school's spring production. On that afternoon he explained the reasons for his decision to Mrs. Coverdale.

When Dr. Postlethwaite reviewed the play, he did not find that it mocked God or prayer; but rather that it mocked people who were "hypocritical" about their religion.[1] He found it inappropriate as a high school production, however, because of its emphasis on, and references to, sexual activities. He considered whether it would be feasible to render the production by further modification, but concluded that it was not.[2]

A regular meeting of the Board of the Caesar Rodney School District was held on March 17th. The Board set aside a portion of the meeting to hear the views of interested parents regarding Dr. Postlethwaite's decision. Four spoke in favor of Pippin; one spoke against; and the Board declined to intervene in the matter.[3]

This suit was filed on March 23rd. The defendants are Dr. Postlethwaite and the members of the school board. A trial was held on April 7th and 8th, and this Opinion contains my findings of fact and conclusions of law based upon the evidence there presented.

Pippin is a fictionalized account of a portion of the life of Charlemagne's son who bore that name. Pippin is young, single, and determined that he shall live a truly

---

1. Dr. Postlethwaite did have some concern about whether some of the references in Pippin to religious subject matter would be likely to be misunderstood by some, but this concern was not a reason for his decision to stop the production.

2. After this suit was commenced, the defendants offered to permit a more heavily edited version of Pippin to be produced and filed an Offer of Judgment embodying that proposal. (Docket No. 13). It is expressly or tacitly ac-

knowledged by each side that this version compromises the integrity of Pippin as a dramatic work.

3. Towards the end of this segment of the meeting, one parent asked a question of Dr. Postlethwaite and understood his response to indicate that he was foreclosing a spring production of any work. Dr. Postlethwaite decided only to foreclose production of Pippin and Mrs. Coverdale so understood that decision.

meaningful life. The play chronicles his several efforts to find himself and the meaning of existence. In turn, he tries, among others, the "glories" of war, the "joys" of the flesh, and exhilaration of social and political reform, the artistic life, and the way of the church; each is ultimately unsatisfying. The close of the play, however, finds him "trapped ... but happy" in a simple life of ordinary responsibilities and in a relationship with a widow and her son. Two segments of the original script caused both Mrs. Coverdale and Dr. Postlethwaite concern, though to differing degrees. In scene four, entitled "The Flesh", Pippin's grandmother, Berthe, sings of the joys of the flesh and urges Pippin to take advantage of his youth while he can. This is followed by a dance in which several girls attempt to seduce Pippin and which culminates in a sequence where, as described in the stage directions, "ALL the BOYS and the GIRLS become involved and THEY begin to show PIPPIN every possible form of sexual activity." Pippin's enthusiasm ultimately wanes and by the end of the dance he is exhausted and repelled. The version of the play which Mrs. Coverdale gave to Dr. Postlethwaite retained Scene Four, but "toned down" the dance. Her annotated script indicated that the "dancers will 'entice' Pippin" but that "the 'tone' will be tasteful."

By Scene Seven Pippin has begun to experience some of the things which he will ultimately come to value. He experiences genuine affection for the widow Catherine and ultimately they go to bed on stage while dancers simulate sexual intercourse. In the expurgated version, the bed scene and the dance were stricken. Instead Pippin and Catherine embrace and then walk off the stage hand in hand. In the context of the remainder of the play, it is implicit that they have experienced physical intimacy.

## ANALYSIS

■ It is now settled law that students do not "shed their constitutional rights of freedom of speech and expression at the schoolhouse gate." It is equally well established, however, that the First Amendment must be "applied in the light of the special characteristics of the school environment." *Tinker v. Des Moines School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1968). A school community is not a microcosm of our society. It exists for a specialized purpose—the education of young people. This purpose has significant implications for the First Amendment rights of students, implications which frequently are in tension.

On the one hand, the educational purpose of secondary schools demands that students be exposed to a wide range of ideas and develop the ability to distinguish and choose among them. As Mr. Justice Brennan eloquently put it in *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967):

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. *Shelton v. Tucker*, [364 U.S. 479,] at 487 [81 S.Ct. 247, at 251, 5 L.Ed.2d 231]. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."

On the other hand, not all ideas and perspectives can be addressed in the course of a school's program. Limitations of time and resources, among other things, dictate that choices be made. Moreover, since the objective of the process is the "inculcation of both knowledge and social values" in young people,[4] these decisions as to what will be taught will necessarily involve an acceptance or preference of some values over others. Any application of the First Amendment in the context of a school community has to take cognizance of the fact that these value judgments must be made. As the Second Circuit Court of Appeals put

---

4. *Pico v. Board of Education*, 638 F.2d 404 at 432 (2nd Cir., 1980) (Newman, J. concurring).

it in *James v. Board of Education*, 461 F.2d 566, 573 (2d Cir. 1972):

> ... The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom ... [A] principal function of all elementary and secondary education is indoctrinative—whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community. "[S]ome measure of public regulation is inherent in the very provision of public education." Note, Developments in the law-Academic Freedom, 81 Harv.L.Rev. 1045, 1053 (1968)....

In recognition of the fact that such choices must be made, the Supreme Court has cautioned restraint in judicial interference with those decisionmakers who have shouldered the responsibility for the educational process. In *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), for example, the Court observed:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values....

■ As the concluding portion of this quotation indicates, however, school officials are not exempt from the operation of the First Amendment. The core value of that amendment is the free expression of ideas and that value is "directly and sharply implicate[d]" when school officials go beyond teaching to conduct which tends to suppress the free exchange of ideas in the school community. As Judge Newman has recently put it:

> The plenary power of school officials transgresses First Amendment limits ... when their actions tend to suppress ideas. It is one thing to teach, to urge the correctness of a point of view. But it is quite another to take any action that condemns an idea, that places it beyond the pale of free discussion and scrutiny....

*Pico v. Board of Education*, 638 F.2d 404 at 432–433 (2d Cir., 1980) (Newman, J. concurring). It is this danger which requires that resort to the courts remain a viable alternative for members of the school community.

■ Neither counsel nor the Court has found a reported decision applying the First Amendment in the context of a school sponsored play. The parties have thus been forced to rely by analogy on cases involving the removal of books from the school library and the suppression of student publications or protests. While the discussions in these cases regarding First Amendment values and the legitimate demands of the school environment are relevant here, they address problems quite distinct from that presented in this case. This is true because the role of a school sponsored theatrical production in the life of the school is quite different from that of the library or of non-program related expressions of student opinion.

It is important to understand at the outset that the Caesar Rodney spring production is viewed by staff and administration alike as an integral part of the school's educational program. It, like the other parts of the school's theater arts program, is intended to provide an educational experience both for the students who participate in staffing it and for those who attend.[5] For this reason, the selection of the artistic work to be given as the spring production does not differ in principle from the selection of course curriculum, a process which

---

5. It is true that participation and attendance is voluntary and thus depends on interest. This makes it no less a part of the school's educational program, however. Like elective courses, the spring production is designed to provide an educational experience for those who choose to participate. At Caesar Rodney there is, in addition, a direct tie to course curriculum. Mrs. Coverdale teaches a course in theater arts and students in that course are given credit for participation in one of the two dramatic productions of the year.

courts have traditionally left to the expertise of educators. Just as a student has no First Amendment right to study a particular aspect or period of history in his or her senior history course, he or she has no First Amendment right to participate in the production of a particular dramatic work or version thereof. Those charged with the responsibility for the success of the school's educational program must be permitted to make decisions of this kind even though those decisions will determine the character of the student expression which will be relevant in history class or appropriate on stage.

Moreover, a school play is not just another source of ideas and perceptions to be considered and evaluated by students; it is an activity sponsored by the school for the viewing of the school community. For this reason, there is a far greater risk than in the area of student protest or library bibliography that the point of view or expression found in the play will be viewed as sanctioned or endorsed by the school as an institution. This fact is important because a "school has an important educational interest in avoiding the impression that it has authorized a particular expression" which is not characteristic of its educational program. *Thomas v. Board of Education, Granville Centennial School District*, 607 F.2d 1043, 1049 (2d Cir. 1979).

This is not to say that all actions of school officials regarding school sponsored programming is immune from First Amendment scrutiny. A school administration might conceivably undertake a course of conduct with respect to programming which systemically suppressed expression of particular points of view or otherwise so chilled the atmosphere for student and teacher expression as to threaten to create "a pall of orthodoxy" over the school community. *Keyishian v. Board of Regents*, 385 U.S.

589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967). But nothing of that character is going on here. This case involves nothing more than differing judgments on the extent to which certain aspects of human sexuality should be represented on stage by high school students. This conflict between the judgment of Mrs. Coverdale and Dr. Postlethwaite is one of those "conflicts which arises in the daily operation of school systems" which should not be the occasion for federal court intervention in the school community. *Epperson v. Arkansas, supra*, at 104, 89 S.Ct. at 270. The resolution of that conflict did not have the effect of prohibiting any Pippin participant from expressing any idea or of placing any subject matter beyond the pale of discussion at Caesar Rodney. It did not result in punishment or a reprimand of anyone for any expression in the past nor can one reasonably anticipate that it will have any future chilling effect on the free exchange of ideas in the school community.[6]

The absence of any intention to foreclose the free exchange of ideas by students or faculty is forcefully demonstrated by the continuing presence of two unexpurgated copies of Pippin in the school library. If the motivating force of Dr. Postlethwaite's action had been the censorship of certain ideas or perspectives, one would not expect these scripts to remain available for student perusal.[7]

Plaintiffs argue that, even if defendants should be permitted some leeway in determining what is to be portrayed in a school production and how, they have overstepped the realm of reason and have acted arbitrarily and capriciously in this particular instance. In the absence of some reason to believe that defendants' actions have "directly and sharply implicate[d]" basic constitutional values, I perceive no basis for my reviewing Dr. Postlethwaite's decision by

6. Dr. Postlethwaite's intervention and reversal of Mrs. Coverdale's decision was not such an extraordinary phenomenon in the life of the school that it is likely to cast a "pall of orthodoxy" over the school community. While he had never had occasion to take similar action before, all involved in the school community realized that the administration would exercise

continuing judgment with respect to school dramatic productions.

7. Nor would one expect the defendants to have offered to allow "Pippin" to go forward with a version edited by a member of Dr. Postlethwaite's staff. *See* note *supra,* p. 236.

an "arbitrary and capricious" standard or otherwise. *Cf. Bicknell v. Vergeness Union High School Board of Directors*, 638 F.2d 438 (2d Cir., 1980).[8]

█ Finally, I agree with defendants that liability for damages, if otherwise appropriate, would be precluded by official immunity. Public officials are subject to damage liability only when they have acted in bad faith or when they have violated some well established tenet of constitutional law of which any reasonable person in their positions would have been aware. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). I am persuaded that all of the defendants acted in what they perceived to be the best interest of the students and the school and, as previously indicated, there was no existing case law to which they could have looked to determine their constitutional responsibilities in this context.

Judgment will be entered for the defendants.

---

**8.** I do not view Dr. Postlethwaite's decision as arbitrary or capricious, however. It is, of course, true that students have access to far more explicit treatments of pre-marital and extra-marital sex than anything contained in Mrs. Coverdale's modified version of Pippin simply by turning on the television set. It certainly is not irrational, however, for a district superintendent to conclude that the objectives of his district's educational program would be better served by a standard different from those utilized by the television networks. It is also true that there are other high schools which have successfully produced Pippin in some form. Indeed, I am confident that there are many school communities in which Mrs. Coverdale's modified version would be considered entirely appropriate. This does not, however, mean that reasonable minds could not differ about the propriety of its presentation.