668 F.2d 214
 2 Ed. Law Rep. 379
 James E. SEYFRIED, Individually and as next friend of Debbie
Seyfried, a minor child; Frances L. Taylor, individually and
as next friend of Keith Robert Taylor, a minor child, and
Durward Allen Ekas, Individually and as next friend of
Deborah Ekas, a minor child, Appellants,
v.
Bruce R. WALTON, Gooden T. Warren, Joshua T. West, Wellford
W. Inge and Kenneth LaVere, individually and as members of
the Board of Education of the Caesar Rodney School District,
F. Neil Postlethwaite, individually and as Superintendent of
the Caesar Rodney School District, and Caesar Rodney School District.
 No. 81-1927.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 2, 1981.
Decided Dec. 29, 1981.
 
 Ernest S. Wilson, Jr., Wilson & Whittington, Wilmington, Del., John Williams (argued), Prickett, Jones, Elliott, Kristol & Schnee, Dover, Del., for appellants.
 Nicholas H. Rodriguez, Catherine T. Hickey (argued), Schmittinger & Rodriguez, P. A., Dover, Del., for appellees.
 Before ALDISERT, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question presented is whether a public school superintendent's decision to cancel a high school dramatic production because of its sexual theme violated the students' first amendment right of expression. Plaintiffs, parents of three students in the play, sued the school district, the school board, and the district superintendent, seeking compensatory and equitable relief under 42 U.S.C. § 1983. The district court, sitting without a jury, held that the school superintendent's decision to cancel the production as inappropriate for school sponsorship was no different from other administrative decisions involving allocation of educational resources and that the cancellation did not offend the students' first amendment rights. We accept the reasoning given by the district court and we will affirm for the reasons set forth in Judge Stapleton's opinion. Seyfried v. Walton, 512 F.Supp. 235 (D.Del.1981).
 
 I.
 
 2
 Because the facts underlying this controversy were set out in detail by the district court, our recitation will be abbreviated. Caesar Rodney High School, located in Dover, Delaware, sponsors autumn and spring theatrical productions each year. In December 1980, the director of the spring production, an English teacher at the school, selected the musical "Pippin" for presentation the following spring. Because the play contained certain sexually explicit scenes, the director consulted the assistant principal before reaching a final decision. After the director edited the script, she and the assistant principal agreed that the revised scenes, although still sexually suggestive, were appropriate for a high school production.
 
 
 3
 In March 1981, shortly after rehearsals for the spring production had begun, the father of a "Pippin" cast member complained to his brother, the president of the school board, that the play mocked religion. The board president directed the district superintendent to look into the matter. After reviewing the edited script, the superintendent determined that the play did not mock religion, but that it was inappropriate for a public high school because of its sexual content. He directed the principal to stop production of the play. After hearing the views of interested parents, the school board refused to overturn the superintendent's decision. As a result, the school did not present a spring play in 1981.
 
 
 4
 Parents of three members of the "Pippin" cast and crew then filed a civil rights action under 42 U.S.C. § 1983, claiming that the students' first amendment rights of expression had been unconstitutionally abridged. After a two-day trial, the district court entered judgment in favor of the defendants. Plaintiffs appeal.
 
 II.
 
 5
 Appellants' principle contention is that the students of the "Pippin" cast and crew had a first amendment right to produce the play. Although we agree that, in general, dramatic expression is "speech" for purposes of the first amendment, see Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557-58, 95 S.Ct. 1239, 1245-46, 43 L.Ed.2d 448 (1975), we also agree with the district court that the decision to cancel the production of "Pippin" in these circumstances did not infringe on the students' constitutional rights.
 
 
 6
 In his well reasoned opinion, Judge Stapleton noted that a school community "exists for a specialized purpose-the education of young people," including the communication of both knowledge and social values. 512 F.Supp. at 237. The first amendment, he concluded, must therefore be "applied in light of the special characteristics of the school environment...." Id. (quoting Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)).
 
 
 7
 We believe that the district court properly distinguished student newspapers and other "non-program related expressions of student opinion" from school-sponsored theatrical productions. 512 F.Supp. at 238-39. The critical factor in this case is the relationship of the play to the school curriculum. As found by the district court, both the staff and the administration view the spring production at Caesar Rodney as "an integral part of the school's educational program." Participation in the play, though voluntary, was considered a part of the curriculum in the theater arts. 512 F.Supp. at 238 & n.5. On review of the record we conclude that this finding is not clearly erroneous. Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d Cir. 1972). Viewed in this light,
 
 
 8
 the selection of the artistic work to be given as the spring production does not differ in principle from the selection of course curriculum, a process which courts have traditionally left to the expertise of educators. Just as a student has no First Amendment right to study a particular aspect or period of history in his or her senior history course, he or she has no First Amendment right to participate in the production of a particular dramatic work or version thereof.
 
 
 9
 Id. at 238-39.
 
 
 10
 The district court also noted the likelihood that the school's sponsorship of a play would be viewed as an endorsement of the ideas it contained. A school has an important interest in avoiding the impression that it has endorsed a viewpoint at variance with its educational program. The district court cautioned that administrators may not so chill the school's atmosphere for student and teacher expression that they cast "a pall of orthodoxy" over the school community, Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683-84, 17 L.Ed.2d 629 (1967), but it found no such danger here. 512 F.Supp. at 239. The court found that no student was prohibited from expressing his views on any subject; no student was prohibited from reading the script, an unedited version of which remains in the school library; and no one was punished or reprimanded for any expression of ideas. In light of these facts, the court could find no reasonable threat of a chilling effect on the free exchange of ideas within the school community. These findings are amply supported by the record.
 
 
 11
 We agree with the district court that those responsible for directing a school's educational program must be allowed to decide how its limited resources can be best used to achieve the goals of educating and socializing its students. "Limitations of time and resources ... dictate that choices be made.... (S)ince the objective of the process is the 'inculcation of both knowledge and social values' in young people, these decisions as to what will be taught will necessarily involve an acceptance or preference of some values over others." 512 F.Supp. at 237 (quoting Pico v. Board of Education, 638 F.2d 404, 432 (2d Cir. 1980) (Newman, J., concurring), cert. granted, --- U.S. ----, 102 S.Ct. 385, 70 L.Ed.2d 205 (1981).
 
 
 12
 Because of the burden of responsibility given to school administrators, courts are reluctant to interfere with the operation of our school systems. As the Supreme Court has observed:
 
 
 13
 By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.
 
 
 14
 Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). We agree with the district court that the conflict here does not "directly and sharply implicate" the first amendment rights of the students. We hold, therefore, that the court properly entered judgment for the defendants.
 
 III.
 
 15
 The judgment of the district court will be affirmed.[1]
 
 
 16
 ROSENN, Circuit Judge, concurring.
 
 
 17
 The issues raised in this appeal are complex, for they implicate the thorny tangle which results from the confrontation between the right of local school administrators to determine the content of their pupils' education and the first amendment rights of those very students in the secondary school setting. Although I agree with the majority that school authorities enjoy broad discretion in the making of decisions in curricular matters, I write separately to emphasize that their discretion is not unfettered and that courts have a duty to vindicate the complementary constitutional rights of students to express and to hear more than one point of view.
 
 
 18
 It is important at the outset to make clear the nature of the present challenge. Although the students assert that their right to free expression has been abridged, their challenge at its roots is directed not merely to a restriction of their freedom of expression but also to the school's right to bar their participation in a school-sponsored production of the play.[1] It is not contended that the students subscribe to the weltanschauung embodied in "Pippin" and wish to stage the play to give voice to their views. Thus, the instant dispute concerns the breadth of discretion enjoyed by school authorities to limit the exposure of their students to certain curricular material which the authorities believe to be unsuitable to their charges, and the proper role of the courts in superintending that exercise of discretion.[2]
 
 
 19
 Local control of a school system's curriculum by school boards organized at a community level characterizes the traditional allocation of responsibility for the education of our youth in the United States. Accepting the wisdom of deferring to local school authorities regarding quotidian educational matters, "the courts have traditionally been reluctant to intrude upon the domain of educational affairs, not only in recognition of their lack of educational competence in such matters, but also out of respect for the autonomy of educational institutions." Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1050 (1968); see Comment, Challenging Ideological Exclusion of Curriculum Material: Rights of Students and Parents, 14 Harv.C.R.-C.L.L.Rev. 485, 487-88 (1979) (hereinafter Comment ). The Supreme Court has repeatedly given voice to this need for judicial deference "to the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards," concerning educational matters. See, e.g., Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969); accord, Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).
 
 
 20
 Other courts have also proved reluctant to interfere with the educational decisions of school officials. See, e.g., Zykan v. Warsaw Community School Corp., 631 F.2d 1300 (7th Cir. 1980); Cary v. Board of Education, 598 F.2d 535 (10th Cir. 1979); President's Council, District 25 v. Community School Board No. 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). The simple fact that those decisions are usually governed by school administrators' social, political, and moral tastes is fully consistent with local control over primary and secondary education. Zykan v. Warsaw Community School Corp., supra, 631 F.2d at 1305-06.
 
 
 21
 At the same time, however, "(o)ur courts ... have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968); see, e.g., Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); West Virginia State Board of Education v. Burnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). And nowhere is " '(t)he vigilant protection of constitutional freedoms ... more vital than in the community of American schools.' " Epperson v. Arkansas, supra, 393 U.S. at 104, 89 S.Ct. at 270 (quoting Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960)). These and other judicial decisions which were willing to intrude into the operation of school systems emphasize the essential role played by education in the intellectual and moral development of our youth,[3] and the concomitant need to expose our youngsters "to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.' " Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).
 
 
 22
 Although many of the decisions regarding first amendment guarantees in the schoolhouse are concerned with the rights of students and teachers to express their views, see, e.g., Tinker v. Des Moines Independent Community School District, supra; James v. Board of Education, 461 F.2d 566 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), there has also emerged a corresponding right of students to challenge on first amendment grounds actions of school officials which circumscribe the range of ideas to which students are exposed.[4] In addition to its foundation in basic first amendment expressive values, the right of students to object to overly narrow or ideological curriculum-related decisions finds support in the concept of "freedom to hear" recently clarified by the Supreme Court in Virginia State Board of Pharmacy v. Virginia Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); see President's Council, District 25 v. Community School Board No. 25, 409 U.S. 998, 999, 93 S.Ct. 308, 309, 34 L.Ed.2d 260 (1972) (Douglas, J., dissenting from denial of certiorari); Zykan v. Warsaw Community School Corp., supra, 631 F.2d at 1304; Minarcini v. Strongville City School District, supra, 541 F.2d at 583; Comment, supra, at 513-17.
 
 
 23
 It is the inherent tension between these two essential functions, on the one hand exposing young minds to the clash of ideologies in the free marketplace of ideas, and on the other hand the need to provide our youth with a solid foundation of basic, moral values, that gives rise to the present dispute. Striking a balance between them is difficult; and not all distortions will require judicial intervention. The Supreme Court has acknowledged this tension:
 
 
 24
 Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values. On the other hand, ... (a)s this Court said in Keyishian v. Board of Regents, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (footnote omitted).
 
 
 25
 Epperson v. Arkansas, 393 U.S. 97, 104-05, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). It remains for this and other courts to evolve criteria for determining when constitutional values are so sharply implicated that judicial intervention is necessary.
 
 
 26
 In attempting to reconcile these goals in a particular case, several observations can be made. First, the court can take judicial notice of the progressively higher levels of intellectual and emotional development of students in the later grades of secondary school. As a result, more deference should be shown school authorities' curricular decisions regarding grade school, and perhaps junior high school students, in the face of a challenge that a particular point of view has been excluded.[5] High school students, in contrast, are at an age approaching both adulthood and franchise. As the Second Circuit has noted in a related context, "It would be foolhardy to shield our children from political debate and issues until the eve of their first venture into the voting booth. Schools must play an essential role in preparing their students to think and analyze and to recognize the demagogue." James v. Board of Education, 461 F.2d 566, 574 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).
 
 
 27
 A second consideration to be evaluated is the nature of the material, access to which the school authorities are attempting to restrict, and the basis for the restriction. Great deference should be accorded when material is deemed unsuited for youths, for example, because of its overt sexual references or because it is otherwise deemed vulgar and unsuited for youngsters. Local authorities have always enjoyed wide latitude in proscribing material which, although not obscene, because of its sexual content is deemed inappropriate for minors. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). In contrast, a court should have much less tolerance for any attempt to exclude a particular point of view from open consideration in the school. See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The evil to be avoided is the ideological indoctrination which would result from attempting to attain the laudable goal of instilling our youth with a set of moral values by barring their exposure to ideas inconsistent with those values.[6] Again, the age of the students will be significant. A decision to limit the exposure of young adolescents, who have less developed critical skills, to works such as Mein Kampf, which express an ideology that school administrators find abhorrent, should normally remain undisturbed. See Comment, supra, at 524. The same would not be true if the students in question were high school seniors.
 
 
 28
 Weighing the pertinent considerations, the instant claim does not command the intervention of the courts. The school superintendent objected to production of "Pippin" not because of its ideas-a youth's search for the meaning of existence-but because of its explicit sexual overtones. School authorities should have more latitude in limiting the performance by their students in a school forum of a play which the authorities find vulgar and inappropriate because of sharp sexual overtones. Their acquiescence in such a performance might be construed as tacit approval of not only the performance but also the play's content.
 
 
 29
 No attempt has been made to restrict access to the play: two copies of the unedited script remain available in the school library. Nor is it alleged that discussion of the play or its subject matter has been restricted. In sum, the decision of the school authorities to prohibit production of "Pippin" in a high school forum because of its sexual overtones does not threaten to stifle the free exchange of ideas so as to warrant judicial interference with the decision of the school authorities.
 
 
 30
 I therefore agree that the judgment of the district court should be affirmed.
 
 
 
 [1]
 We have considered the remaining arguments raised by appellants and we conclude that they are without merit. Because of our disposition of this case we need not consider the parties' contentions on the issue of immunity from damages
 
 
 [1]
 The district court found that participation in the school play "does not differ in principle from the selection of course curriculum," 512 F.Supp. at 238, a finding I accept as not clearly erroneous
 
 
 [2]
 In the present case a school superintendent overrode the decision of a dramatic arts teacher to produce "Pippin." The teacher has not challenged that action, and has not been in any way reprimanded for her decision. Thus neither the statutory and constitutional rights of teachers, acting at variance with the views of school administrators, to expose their students to certain views, nor a teacher's own constitutional right of free expression are before the court
 
 
 [3]
 Public education ... "fulfills a most fundamental obligation of government to its constituency." Foley (v. Connelie, 435 U.S. 291, 297, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978) ). The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of values on which our society rests, has long been recognized by our decisions
 Ambach v. Norwick, 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979).
 
 
 [4]
 Most of the decisions involve the right of school authorities to exclude or remove certain books from the school library. In general, those actions have been upheld when they related only to the inclusion of the books in the school library and when discussion of the subject matter covered by the books was not also proscribed. Compare Cary v. Board of Education, 598 F.2d 535, 544 (10th Cir. 1979) (teachers not prohibited from treating books in class "as examples of contemporary poetry, literature, or American masters") and President's Council, District 25 v. Community School Board No. 25, 457 F.2d 289, 292 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972) (removal of book to restricted shelf in library did not preclude discussion of subject covered by book in class) with Pico v. Board of Education, 638 F.2d 404, 436 (2d Cir. 1981), cert. granted, --- U.S. ----, 102 S.Ct. 385, 70 L.Ed.2d 205 (1981) (Newman, J., concurring) (allegation that removal of books "was designed to suppress ideas"), and Minarcini v. Strongsville City School District, 541 F.2d 577, 579 (6th Cir. 1976) (school board prohibited teacher and student discussion in class of books not approved by board)
 A recent district court decision from the Northern District of Mississippi addressed a more direct challenge to school officials' control of curriculum decisions. In Loewen v. Turnipseed, 488 F.Supp. 1138 (N.D.Miss.1980), students, their parents, and their teachers successfully challenged a decision of the Mississippi "textbook rating committee" not to purchase a particular textbook designed for a ninth grade course in Mississippi history. The plaintiffs argued that the excluded textbook presented a more complete view of the role of blacks in Mississippi. The court concluded, inter alia, that the students' first amendment rights to a free and open educational system had been abridged. Id. at 1152-54.
 
 
 [5]
 A school board's decision may be so blatantly aimed at curtailing a particular viewpoint that even a decision regarding the curriculum for young adolescents warrants judicial intervention. See Loewen v. Turnikspeed, 488 F.Supp. 1138 (N.D.Miss.1980); note 4 supra
 
 
 [6]
 Of course it may sometimes be difficult to ascertain whether school officials have acted to suppress "politically unpopular ideas," Pico v. Board of Education, 646 F.2d 205, 714 (2d Cir. 1981), cert. granted, --- U.S. ----, 102 S.Ct. 385, 70 L.Ed.2d ---- (1981) (Newman, J., concurring in the denial of rehearing en banc ) or whether they sought merely to prevent students from encountering "obviously indecent and vulgar material." Id. at 716 (Mansfield, J., dissenting from denial of en banc consideration)