Heather **BOWMAN, et al., Plaintiffs,**

v.

**BETHEL–TATE BOARD OF EDUCATION, et al., Defendants.**

**No. C–1–85–864.**

United States District Court, S.D. Ohio, W.D.

May 6, 1985.

John Woliver, Batavia, Oh., Patrick Gregory, of-counsel, Mt. Orab, Oh., for plaintiffs.

J. Michael Fischer, Judy L. Pershern, Cincinnati, Oh., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge:

### I. INTRODUCTION

This matter came on for consideration on plaintiffs' motion for a preliminary injunction (doc. 5), which defendants opposed (doc. 6). Plaintiffs filed suit pursuant to 42 U.S.C. § 1983 (*see* doc. 1). Previously this Court had granted plaintiffs' motion for a temporary restraining order on April 25, 1985 (doc. 3). Because of the time element involved and the simplicity of the issue presented, in identification if not in substance, the parties agreed that the hearing held on plaintiffs' motion for a preliminary injunction be on the merits. At said hearing, held on May 2, 1985, only one witness was called; the parties then immediately proceeded into oral argument. From the Bench we ruled that defendants were to be permanently enjoined from interfering in any way with the rehearsal and presentation of the play *Sorcerer and Friends*, scheduled for performance on May 13, 1985. We also ruled, however, that no part of the rehearsal or staging of the play should be included in any regular third grade classroom time—that is, during normal school hours.

At the outset the parties agreed that the essential facts were not in dispute. To reach our decision, this Court had to make only one critical finding of fact: whether participation in the play was voluntary or compulsory. From that finding flowed our ultimate conclusion of law that the Board had acted unconstitutionally in ordering a halt to production of *Sorcerer*. In accordance, then, with Fed.R.Civ.P. 52(a), having considered all of the evidence and the arguments and memoranda of counsel as well as the demeanor of Ronald E. Smith, the

only witness called to the stand, including his appearance, attitude, and behavior, we now proceed to set forth our findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. The Ebon C. Hill Elementary School is located in the Bethel-Tate School District in Clermont County, Ohio. (Affidavit of David E. Weidner, Principal, Ebon C. Hill Elementary School.) The Bethel-Tate Local School District Board of Education (Board) has immediate supervisory power over schools within the Bethel-Tate School District and was the governing body that made the decision to halt production of the play *Sorcerer and Friends.* (Testimony of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.)

2. Third graders at the Ebon C. Hill Elementary School had been rehearsing the above-mentioned play in anticipation of performance on May 13, 1985, the date of the final Parent-Teachers Association (PTA) gathering. (Affidavits of Carol Childers, Betty Bloom, Marianne Moran, Dorothy Bowman, plaintiffs; of Liz Dorton, Sherri Howser, teachers; of Deborah Hudepohl, President, PTA.) Third grade entertainment at the final PTA meeting of the year is customary. (Affidavits of Carol Childers, Betty Bloom, Marianne Moran, plaintiffs; of Liz Dorton, Sherri Howser, teachers.) *Sorcerer* was selected as this year's play because it is a musical-comedy, has a large number of parts no one of which requires a great deal of memorization, and was thought to be, in the teachers' view, a suitable undertaking for third graders. (Affidavits of Carol Childers, Betty Bloom, Marianne Moran, plaintiffs; of Liz Dorton, Sherri Howser, teachers.)

3. *Sorcerer* began rehearsal during the first week of March, 1985. Rehearsals were held both before and after regular school hours. In addition, the songs in the play were practiced during music class, a portion of the school's normal class schedule. (*See* affidavits of Carol Childers, Betty Bloom, Marianne Moran, plaintiffs; of Liz Dorton, Sherri Howser, teachers). On

or about March 28, 1985, questions were raised about the content of the play. In response, the school's principal communicated with third grade parents and asked that, upon review of a play synopsis and lyrics, they advise him whether they favored production of the play. This survey yielded a result of 44 parents in favor and 7 opposed, with 3 parents expressing no opinion. At the behest of the Board, during the week of April 11, 1985, the entire play was submitted to third grade parents. This second survey yielded 90 parents for *Sorcerer.* 23 against, and 2 without opinion. (Affidavit of David E. Weidner, Principal, Ebon C. Hill Elementary School.)

4. On April 18, 1985, the Board, in receipt of the second survey results, voted to halt production of the play. (Affidavit of David E. Weidner, Principal, Ebon C. Hill Elementary School; of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.) The Board's vote was prompted by its disagreement with the ideas contained therein. (Affidavit of David E. Weidner, Principal, Ebon C. Hill Elementary School; testimony and affidavit of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.) Specifically, in the opinion of the Board, *Sorcerer* glorifies cowardice, denigrates patriotism, and disparages the aged. (Affidavit of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.)

5. Both student and teacher participants in *Sorcerer,* or in whatever play is produced by the third grade for performance at the May PTA meeting, is completely voluntary. "Voluntary" means that a student could decline to participate because no letter grade was given and no sanction imposed against non-participants. (Testimony of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.) In addition, voluntariness is evidenced by the fact that rehearsals are held before, after, but not during, regular school hours.

6. The Board acknowledges that those courses of study it must provide the school

children for whom it is responsible are the subjects set forth in Ohio Revised Code § 3313.60. The Board further acknowledges that these basic courses define the school's curriculum. While extra-curricular activities designed to effect personal development are offered, participation therein is a completely voluntary decision made by parents and children. (Testimony of Ronald E. Smith, President, Bethel-Tate Local School District Board of Education.)

### III. CONCLUSIONS OF LAW

■ By all counts, participation in *Sorcerer and Friends* is voluntary. And because participation is invited rather than compelled, the play at issue falls not within the confines of curriculum, an area over which a local board of education has an exceptional amount of discretion. Instead, rehearsal for and presentation of *Sorcerer* is an extra-curricular activity and shall be so analyzed.

On many occasions the United States Supreme Court has examined the constitutional rights of youngsters within their school environments. In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court struck down a criminal state that forbade the teaching of a foreign language to a child unless he or she had passed the eighth grade. Despite the purpose of the legislation, "to promote civic development by inhibiting training and education of the immature in foreign tongues and ideals before they could learn English and acquire American ideals," *see id.* at 401, 43 S.Ct. at 627, the Justices decided that children could be taught modern languages other than English. *See also Bartels v. Iowa*, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923). *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), involved a challenge to the constitutionality of a state statute that prohibited the teaching of the theory of evolution in Arkansas' public school and universities. The Court's ruling was clear: "The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penal-

ty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the [Establishment and Free Exercise Clauses of the] First Amendment." *Id.* at 107, 89 S.Ct. at 272. No doubt the decision in *Epperson* was reached easier than in *Meyer*, for, in the latter, the state, much like the Board here, was guided honorably by its efforts to promote patriotism.

Plainly the Supreme Court instructs that neither "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). The above-cited cases are but a sampling of the case law that made possible those famous words written by Justice Fortas in *Tinker*. And were this Court forced to draw broad analogies in order to resolve the question at hand, we are confident we could do so. But Supreme Court precedent offers us more than general guidance in this instance. Given the instant facts, we believe *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) controls our decision and mandates that it be in favor of plaintiffs.

At issue in *Island Trees*, a plurality opinion, was whether the First Amendment limits a local school board's discretion to remove certain library books from junior and senior high school libraries. The Supreme Court responded in the affirmative.

A number of parallels can be drawn between *Island Trees* and the instant case. Visits to the library to check out books for pleasure reading is a voluntary activity and not part of the school's curriculum. *Id.* at 869, 102 S.Ct. at 2809. The Board's president testified that preparation for and performing in *Sorcerer* also is voluntary. But defendants' counsel argued that, notwithstanding its voluntariness, the play is part of the school's offerings of avenues of personal development, necessary adjuncts to the curriculum and thus controllable as

within the Board's nearly plenary discretion. As a matter of law, we conclude otherwise. Surely no one would dispute that a library and its contents make available unlimited opportunities for personal development, and yet the Supreme Court found its existence to be outside the school's curriculum. Thus we decide that, as with the Island Trees library, participation in *Sorcerer* is voluntary and not part of the school's curriculum.

The Island Trees Board removed the books from the libraries under their supervision because they were "'irrelevant, vulgar, immoral, and in bad taste.'" *Id.* at 859, 102 S.Ct. at 2804. Bethel-Tate has shut down production of *Sorcerer* because the play allegedly glorifies cowardice, denigrates patriotism, and disparages the aged. Island Trees removed the books in the face of contrary views of teachers and librarians in their own school system, the Superintendent of Schools, publications that specialize in rating books for students of the ages involved, and literary experts. *Id.* at 874, 102 S.Ct. at 2811. Bethel-Tate's Board has acted despite contrary opinions expressed by the principal and four other third grade teachers, the president of the PTA, the play's author, and the vast majority of the surveyed parents, not to mention plaintiffs.

In *Island Trees*, Justice Brennan, who announced the judgment of the Court, cited motivation as a key factor. "If [the Board] *intended* by their ... decision to deny [students] access to ideas with which [the Board] disagreed, and if this intent was the decisive factor in [the Board's] decision, then [the Board has] exercised [its] discretion in violation of the Constitution." *Id.* at 871, 102 S.Ct. at 2810 (footnote omitted) (emphasis original). The Court defines "decisive factor" as a substantial factor, "in the absence of which the opposite decision would have been reached." *Id.* at 871 n. 22, 102 S.Ct. at 2810 n. 22. The facts now before us suggest that the Bethel-Tate

Board ordered a halt to production solely because it did not approve of the content of the play.[1] Under the authority of *Island Trees*, we believe that defendants, the Bethel-Tate Local School District Board of Education and its individual members, have acted unconstitutionally in forcing their judgment upon others concerning an event that is extra-curricular. Therefore, a permanent injunction must issue.

In support of their claim that *Sorcerer* rightfully merits inclusion in the curriculum and in the Board's near-total control, defendants cite *Seyfried v. Walton*, 668 F.2d 214 (3d Cir.1981). In that case, a public high school sponsored theatrical productions two times per year. The musical *Pippin* was selected as the 1981 spring production. Soon after rehearsals commenced, a parent complained that the play mocked religion. The public school superintendent eventually cancelled the production, not because of the anti-religious theme, but because the play was too sexually suggestive. The Third Circuit affirmed the district judge's ruling that the cancellation "was no different from other administrative decisions involving allocation of educational resources and that [it] did not offend the students' [F]irst [A]mendment rights." *Id.* at 215.

We decline to follow *Seyfried* for a number of reasons. First, *Seyfried* was decided prior to *Island Trees* and, in this Court's judgment, would not be decided similarly today. We think defendants improperly cite *Bender v. Williamsport Area School District*, 741 F.2d 538 (3d Cir.1984), for the proposition that *Seyfried* remains good law in the Third Circuit. While both *Island Trees* and *Seyfried* were cited in *Bender*, neither were used in a context apposite to the question presented in the instant case. As stated by Judge Garth, *Bender* examined "the tension between the [F]irst [A]mendment free speech claim of high school students meeting in an activity de-

---

1. That the Board considered the play's message to be in derogation of the Board's curriculum philosophy is of no moment legally once we conclude that an extra-curricular activity is at issue. Moreover, a fear that the community will perceive the Board as endorsing the play's message is insufficient justification for suppression of First Amendment freedoms.

voted to prayer, and a school district's claim that the Establishment Clause—also found in the [F]irst [A]mendment—overrides free speech guarantees in the context of a 'limited forum.'" *Id.* at 541. Second, we could consider *Seyfried* to be, at best, persuasive authority; it in no way binds this Court as a member of the Sixth Circuit.

Finally, we can distinguish our facts from those in *Seyfried.* Judge Aldisert was quick to focus his analysis on behalf of the panel: "The critical factor in this case is the relationship of the play to the school curriculum. As found by the district court, both the staff and the administration view the spring production at Caesar Rodney as 'an integral part of the school's educational program.' Participation in the play, though voluntary, was considered a part of the curriculum in the theater arts." 668 F.2d at 216. In contrast, Mr. Smith, in behalf of the Board, made it quite clear that *Sorcerer* is an extra-curricular activity, voluntary in nature. We think this difference to be a crucial one that severely weakens defendants' reliance on the proffered case.[2]

To sum up, in accordance with our duties prescribed in Fed.R.Civ.P. 52(a), we conclude as a matter of law that the Bethel-Tate Local School District Board of Education halted rehearsal for performance of *Sorcerer and Friends*, a voluntary, extra-curricular theatrical production, because it disagreed with some of the ideas expressed therein; consequently, we find the Board's actions to be in violation of the participants' First Amendment rights and, pursuant to our sworn duty to uphold the Constitution of the United States, must enjoin its illegal decision. To borrow the words of Justice Blackmun in *Island Trees,* "allowing a school board to engage in such conduct hardly teaches children to respect the diversity of ideals that is fundamental to the American system." 457 U.S. at 880, 102 S.Ct. at 2814 (Blackmun, J., concurring in part and concurring in the judgment).

▮ Implicit in our Order of injunctive relief is the Court's concomitant direction to the Board that it shall permit the performance of *Sorcerer* to take place, where originally scheduled, on the stage of the middle school auditorium. (*See* affidavit of William Bick, Superintendent, Bethel-Tate Local School District.) Ohio Revised Code § 3313.77 provides that, pursuant to local policy and upon request and payment of a reasonable fee, a school board may make available its facilities for "recreational meetings and entertainments, and for such other purposes as promote the welfare of the community; provided such meetings and entertainments shall be nonexclusive and open to the general public." Without a doubt, PTA meetings fall within this statutory provision. Section 3313.77 requires that a school board draft a local policy, or "regulations." That the PTA is charged neither for use of the auditorium nor for chair set up on the evening that the play is presented bespeaks current policy, perhaps unwritten, that this Court expects to be continued through the end of the present school year.

## IV. CONCLUSION

Accordingly, defendants are hereby permanently enjoined as follows:

Defendants are hereby permanently enjoined from interfering in any way with the rehearsal and presentation of the play *Sorcerer and Friends,* scheduled for performance on May 13, 1985. However, no part of the rehearsal or staging of the play shall be included in any regular classroom time, that is, during normal school hours, of the third grade at the Ebon C. Hill Elementary School.

SO ORDERED.

---

**2.** Plaintiffs' counsel suggested yet another difference at oral argument. In *Seyfried,* the scheduled production, *Pippin,* was halted because of its sexual content. There has been no charge, nor could there be after reading the play, that *Sorcerer* has a sexual theme. But, supposing the play was sexually explicit or suggestive, and supposing further that the Board decided to halt production because of that sexual content, we assume without deciding that the Board's decision might have been upheld as consonant with the Ohio legislature's prohibition of dissemination of matter harmful to juveniles. *See* Ohio Revised Code §§ 2907.31, 2907.01(E).