Megara BELL, b/n/f Michael Bell Peter Eisenbeiser b/n/f Nancy Huelsberg, Jenny McCracken b/n/f JoAnn McCracken, Claudia Welch b/n/f Ray Welch and Benjamin Whalen b/n/f William Whalen

v.

The U–32 BOARD OF EDUCATION, Claudia Bristow, Julian Goodrich, Burtt McIntyre, Kathleen Osborne, Rebecca Shepard, Richard Staudt and Ruth Towne.

Civ. A. No. 84–50.

United States District Court,
D. Vermont.

March 17, 1986.

Alan Rosenfeld, Plainfield, Vt., for plaintiffs.

Robert H. Opel, Paterson, Walke & Pratt, Montpelier, Vt., for defendants.

COFFRIN, Chief Judge.

In this action, plaintiff students allege that the defendant school board abridged their first amendment rights by refusing to allow production of the play *Runaways* as the annual spring musical at U–32 High School in East Montpelier, Vermont, in January 1984. Plaintiffs seek an order compelling production of the play, compensatory damages, and attorney fees. On February 21, 1984, we denied plaintiffs' motion for a preliminary injunction to compel production of the play. The matter is now before us on cross-motions for summary judgment on the merits. Based on the stipulated facts and the parties' agreements, we GRANT defendants' motion for summary judgment, DENY plaintiffs' cross-motion for summary judgment, and ORDER that JUDGMENT be entered FOR DEFENDANTS.

## STIPULATED FACTS

The play at issue, *Runaways,* focuses on the emotions and reflections of several child runaways concerning the problems at home from which they fled and the problems they face alone in the city. Much of the play juxtaposes simultaneous choral sing-song of nursery rhymes and childhood taunts with portrayals of rough life on the streets. Some scenes concern child abuse, child prostitution, alcohol and drug abuse, and rape. In one scene, the actors simulate a rape and murder. The play has little profane language, and there is sporadic humor.

The parties have stipulated to the material facts necessary to determine the issue of liability as follows:

Each spring, U–32 High School sponsors a spring musical, which its students perform both for the school community and for the community at large. The school funds the production initially, covers costs not reimbursed by ticket sales, provides facilities for rehearsals and performances, publicizes the performances, and allows its name to be used as the sponsor of the play in this publicity.

Most of the performers and crew for these productions are selected from the student body, which consists of grades 7–12. The student participants receive grades and academic credit for their participation, and the play is considered to be part of the curriculum. The school employs and specially compensates various faculty members to direct the play and to supervise different aspects of its production. A group of faculty members choose the play each January, and the School Board commonly approves the choice implicitly by appropriating funds for the production.

On or about January 16, 1984, the director of curriculum expressed concern to the high school principal about the appropriateness of the choice of *Runaways* for the 1984 spring musical. After reading the play and discussions with the school administrative team, the faculty members who had selected the play, the director, and other interested staff members, the principal and the superintendent of schools agreed that they could not support production of the play.

The director of performing arts appealed to the school board, and a special board meeting was scheduled for three days later, Monday, January 23, a time which would allow a decision to be made before auditions, which were scheduled to begin on Tuesday. Notice of the meeting was posted in a local store and in the superintendent's office, and a local radio station broadcast notice of the meeting in its weekend public service announcements. All but one of the board members were present at the meeting. Several staff members and students attended and were accorded an opportunity to be heard. Without stating its reasons, the Board voted that the play should not be produced.

Shortly after this meeting, plaintiffs contacted an attorney, who asked the board to reconsider its decision and to articulate its reasons for the decision. In a letter dated February 8, 1984, the Board responded that it would add the motion to reconsider to the agenda of its next regular meeting on Feb-

ruary 23 and that if it did vote to reconsider, any interested persons would have an opportunity to present their views. It also explained its decision not to produce the play as follows:

Runaways deals with strong and mature themes such as drug abuse, alcoholism, prostitution, child abuse, and rape. The U–32 annual spring production is and has been an inherent part of the curriculum of U–32. Furthermore, the commitment of resources to the project has always been made with the expectation that the resulting production would be appropriate viewing for the school community and the community at large. The Board is of the view that the content of Runaways is such that the exercise of mature judgment would compel the seeking of parental consent to view the production for many of the children at U–32. Given the large number of plays available to choose from, the Board does not feel that a production with these inherent limitations and drawbacks constitutes a proper allocation of U–32 educational resources or is otherwise suitable in fulfilling the aims of public education.

Plaintiffs filed this action the same day.

The parties have stipulated that the Board disapproved the play because the play refers to, describes, or depicts sexual activity, child abuse, physical violence, sexual violence, drug abuse, alcohol abuse, and child prostitution. Although the Board did not find that Runaways advocates or glamorizes any of these activities, it concluded that the play involved inappropriate activity for the students who would be involved in performing and producing the play and would be inappropriate viewing as a school-sponsored event for the school community and the community at large.

Runaways is available to the entire student body in the U–32 school library, and it is used as a text in a humanities course at the school. The Board's decision not to produce the play as the spring musical had no effect on the play's availability in the library nor on its use in the humanities course.

## DISCUSSION

Plaintiffs' amended complaint in this section 1983 action asserts three theories under which they assert defendants may be held liable for their actions: 1) direct abridgment of first amendment rights of free speech and communication; 2) abridgment of first amendment rights through the chilling effect of their actions; and 3) deprivation of a liberty interest in free speech without due process of law. We shall address each theory separately.

### I. Direct Abridgment of First Amendment Rights

Plaintiffs' first cause of action asserts that the Board's decision not to produce Runaways directly abridged their first amendment rights to free speech and communication. Defendants argue that the decision was one concerning the school's curriculum, over which they have unfettered discretion in this situation; they did not bar access to the ideas in the play; and their decision was motivated by a proper purpose; thus, they did not abridge plaintiffs' first amendment rights. Plaintiffs respond that because the decision was an "exclusionary" one, it more clearly implicates constitutional values and that the material is not actually inappropriate for children, and therefore should not have been censored.

Both parties couch their arguments in terms of whether the Board's decision "directly and sharply implicates" the students' first amendment rights, citing to our February 21, 1984 Opinion and Order and *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 866, 102 S.Ct. 2799, 2807, 73 L.Ed.2d 1013 (1982) (plurality). They have taken the reference out of context. The issue of whether constitutional rights are implicated is a threshold issue concerning whether a federal court should intervene in conflicts that arise in the day-to-day operation of the schools in light of the state's control of public education generally and the local school board's broad discretion in the management of school affairs. *Pico*,

457 U.S. at 863–64, 102 S.Ct. at 2806. Thus, this issue was a primary concern in our February opinion denying plaintiffs' motion for a preliminary injunction. At this stage of the proceedings, however, we are asked to review the constitutional soundness of a content-based restriction on speech that is protected by the first amendment. We believe that first amendment values are sufficiently implicated to warrant minimal intervention through judicial review of the Board's actions.

Nonetheless, once we have decided that judicial review is warranted, we still must evaluate whether defendants' actions actually abridged plaintiffs' rights. We find they did not. Our analysis begins with a recitation of some underlying and controlling principles.

■ First, the speech at issue is protected by the first amendment. The degree of protection to which speech is entitled, however, varies depending upon the type of speech and the context in which it is spoken or presented. *See FCC v. Pacifica Foundation*, 438 U.S. 726, 744–48, 98 S.Ct. 3026, 3037–39, 57 L.Ed.2d 1073 (1978). Here, we are treating speech that is not obscene, but it does have integral parts that are vulgar, offensive, or indecent; it concerns mature themes that our society generally considers to be inappropriate for young children. Second, the Board's decision was based on the content of the speech. Although restraints based upon content are viewed with greater suspicion, content regulation does not, in and of itself, violate the first amendment. *FCC v. Pacifica Foundation*, 438 U.S. 726, 744, 98 S.Ct. 3026, 3037 (1978).

■ Third, plaintiffs are school children who seek a forum for their speech in school. Although school children certainly do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," the Supreme Court has consistently recognized and upheld "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."

*Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (citations omitted). A student's first amendment rights are subject to some limitation, in light of the "special characteristics of the school environment." *Id.* at 506, 89 S.Ct. at 736; *see Fraser v. Bethel School District No. 403*, 755 F.2d 1356 (9th Cir.), *cert. granted*, —— U.S. ——, 106 S.Ct. 56, 88 L.Ed.2d 45 (1985).

■ Fourth, the state has an interest in the well-being of its youth, *Ginsburg v. New York*, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968), and may adopt more stringent controls on communicative materials available to youths than on those available to adults, *FCC v. Pacifica Foundation*, 438 U.S. at 757, 98 S.Ct. at 3044 (Powell, J, concurring) (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975)); *Upper Midwest Booksellers Association v. City of Minneapolis*, 602 F.Supp. 1361 (D.Minn.), *aff'd*, 780 F.2d 1389, (8th Cir. 1985). "It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354, 78 L.Ed.2d 1113 (1982) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)). Moreover, those charged with responsibility for educating youth have a primary responsibility for their well-being, including a duty to protect them from exposure to material that is considered inappropriate for them. *See Ginsburg*, 390 U.S. at 638–43, 88 S.Ct. at 1279–82; *FCC v. Pacifica Foundation*, 438 U.S. at 749–50, 95 S.Ct. at 3040 (majority op.), 758, 98 S.Ct. at 3045 (Powell, J., concurring).

■ Fifth, in our system, public education is committed to the control of state and local authorities. *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982)

(plurality). Local school boards have broad discretion in the management of school affairs, particularly in matters of curriculum, and have a duty to transmit community values. *Id.* at 863, 864, 102 S.Ct. at 2806. But, this discretion must be exercised in a manner that comports with the "transcendent imperatives of the First Amendment." *Id.* at 864, 102 S.Ct. at 2806. School boards may establish their curriculum in such a way as to transmit community values, *id.*, but it may not deny access to ideas in a way that prescribes an orthodoxy in matters of opinion, *id.* at 869–70, 102 S.Ct. at 2809. Thus, when a school board's actions are challenged on first amendment grounds, the court must look to the board's motivation or reasons for the restriction to determine if there has been a constitutional violation. As Justice Blackmun summarized it,

> As I see it, then, the question in this case is how to make the delicate accommodation between the limited constitutional restriction that I think is imposed by the First Amendment, and the necessarily broad state authority to regulate education. In starker terms, we must reconcile the schools' "inculcative" function with the First Amendment's bar on "prescriptions of orthodoxy."
>
> In my view, we strike a proper balance here by holding that school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved.... [T]he school board must "be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *Tinker v. Des Moines School Dist.*, 393 U.S., at 509 [89 S.Ct. at 737], and that the board had something in mind in addition to the suppression of partisan or political views it did not share.

457 U.S. at 879–80, 102 S.Ct. at 2814 (Blackmun, J., concurring in part) (emphasis in the original, heading omitted). Thus,

improper motive is the key to finding a first amendment violation here.

Applying these principles to the controversy at hand, we first note that the board does not have *unfettered* discretion in any matter; its actions are always subject to constitutional restrictions, whether the decision is "curricular" or not. Moreover, the decision at issue was not solely or even primarily a matter of curriculum. The value of the play as a part of the school's *curriculum* was not challenged, and the play continued to be read and discussed in the school's humanities course. Instead, the play was challenged for its appropriateness as a school-sponsored theatrical production and as an activity for the students, some of whom were quite young. Because that activity was part of the curriculum, the decision was also "curricular." Nonetheless, the distinction between curricular and extra-curricular activities is not particularly pertinent in this context. It is enough that the activity at issue is a school-sponsored program. *See Kuhlmeier v. Hazelwood School District*, 607 F.Supp. 1450, 1462–65 (E.D.Mo.1985); *see also Seyfried v. Wilson*, 668 F.2d 214 (3d Cir.1981).

Not only do school boards have broad discretion in their choice of curriculum and a responsibility to transmit societal values, but they also have primary responsibility for the well-being of their students. This means that, when confronted with activities or materials that are sexually explicit or contain mature themes, the Board has a duty to determine what, according to societal values, is inappropriate for students in the context of school-sponsored activities and to protect its students from inappropriate activities. Plaintiffs ask us to declare that the play is patently appropriate. This we cannot do. The Board is vested with the authority and discretion to make this determination, and unless we can find its determination is clearly erroneous, we will not disturb its determination that the play is inappropriate in these circumstances. Because the Board's determination generally comports with so-

cietal values concerning what is appropriate for children, we will not disturb its determination.[1]

Finally, we turn to the issue of whether the Board's decision abridged plaintiffs' free speech rights. This determination depends upon the Board's motives in prohibiting production of the play. The parties have stipulated that the Board was motivated by the Board's belief that the play was inappropriate as a school-sponsored theatrical production, both as an activity for the students and as viewing for the school community for which it would be performed. We believe this motive is permissible, based on the school board's responsibility for its students' physical and psychological well-being.[2] Moreover, a student's first amendment rights are somewhat limited, in light of the special circumstances of the school environment. Thus, we hold that in this instance, the students' rights to free expression must give way to the board's responsibility for the well-being of the larger student body that would be affected by production of the play. *Accord Seyfried v. Walton*, 668 F.2d 214 (3d Cir. 1981).

██ We find that the Board acted within its authority to safeguard the well-being of its students and did not violate plaintiffs' first amendment rights in refusing to sponsor *Runaways* as its spring musical. Thus, we grant summary judgment in favor of defendants on the first cause of action.

## II. *Chilling Effect on Exercise of First Amendment Rights*

██ Plaintiffs' second cause of action alleges that the Board's decision not to pro-

duce the play had a chilling effect on the students' exercise of their first amendment rights. Defendants maintain that there is no evidence of a chilling effect and no actual chilling effect. Plaintiffs respond that we should deny defendants' motion with respect to this count because there are material facts in dispute concerning this issue; we should permit discovery and an evidentiary hearing on the issue. We agree that there is no evidence in the record of any chilling effect, other than the complaint's bald assertion that it occurred. Plaintiffs' suggestion gives us some trouble, however, in light of the record in this action.

Plaintiffs filed this action February 8, 1984 and immediately sought a preliminary injunction against defendants. We denied the injunction February 21, 1984. Since then, plaintiffs have amended their complaint and made some requests designed to reduce the cost of discovery. On June 14, 1984, we approved plaintiffs' request for an extension of time, to July 1, 1984, to file a discovery schedule. No discovery schedule was filed. Instead, the next filing was a stipulation of facts, signed by the attorneys for all parties, on December 31, 1984. The stipulation begins,

> NOW COME the parties and stipulate and agree to the truth and admissibility of the following facts and documents in the above-captioned matter. The parties agree to waive any right to further discovery in this matter. The parties intend to file a Motion for Summary Judgment and Memoranda based upon this Stipulation. The parties believe that the stipulated facts constitute the material facts necessary for determination of issue of liability and are sufficient to enable the

---

1. We are not unmindful of the irony involved when it is determined that it is inappropriate for some children to see or to portray problems and incidents that are part of other children's lives.

2. Thus, we see plaintiffs' citations to *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir.1982), and *Bowman v. Bethel-Tate Board of Education*, 610 F.Supp. 577 (S.D.Ohio 1985), as inapposite. In *Pratt*, the court found that the school board removed a set of films

from the curriculum because the majority of the board found their ideological and religious theme offensive. 670 F.2d at 776. Similarly, in *Bowman*, the school board had an impermissible motive for prohibiting third graders from producing a play—disagreement with the ideas expressed therein. 610 F.Supp. at 581. In both cases, the board was attempting to prescribe an orthodoxy of ideas. Here, the parties have stipulated, there was no such motive.

court to grant judgment for one of them on all issues of liability.

On June 10, 1985, defendants filed their motion for summary judgment. On June 25, 1985, plaintiffs filed a cross-motion for summary judgment. Both motions sought summary judgment on all counts and specifically incorporated the parties' stipulation of facts. Nonetheless, plaintiffs assert in their memorandum in support of their motion that

> summary judgement should be granted to the plaintiffs ... based on the facts which are not in dispute. However, in the event that the court is not yet persuaded to grant summary judgement in favor of the plaintiffs, it should still be denied to the defendants because there are facts in dispute [regarding the chilling effect of the board's decision on the "general climate of first amendment freedoms of expression at the high school"] ....
>
> ... The stipulated facts were entered into to avoid the need to depose the defendants but do not present information on the possible chilling effects of the decision.

Plaintiffs' Memorandum in Support of Summary Judgment, at 11. Defendants have filed a reply memorandum that objects to plaintiffs' assertion of disputed material facts, stating that the representations should be treated as admissions, citing *Ratner v. Young*, 465 F.Supp. 386 (D.V.I.1979), and that plaintiffs are therefore estopped from raising the issue.

■ Plaintiffs have given no explanation for their inconsistent positions, nor have they offered extenuating circumstances that would justify release from their agreement in the stipulation. Under the facts before us, we can only conclude that plaintiffs knowingly and voluntarily waived their right to any further discovery in this matter. *See, e.g., Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir.1985); *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir.1983); *Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp.

1099, 114 (E.D.Mo.1985). Then, six months later, they filed a motion for summary judgment in which they request an opportunity for discovery and deny their representation in the stipulation that the stipulation resolves all issues of material fact necessary for their motion. Under the circumstances, we believe that plaintiffs are judicially estopped from asserting issues of material fact for which they must conduct more discovery. *See Citation Cycle Co. v. Yorke*, 693 F.2d 691, 695–96 (7th Cir.1982); *Chance v. Board of Examiners*, 561 F.2d 1079, 1092 (2d Cir.1977); *Gordon v. Lipoff*, 320 F.Supp. 905, 909 (W.D.Mo.1970).

As a result, based on the total lack of evidence of any chilling effect in the record, we grant summary judgment in favor of defendants on the second cause of action.

### III. *Due Process Violation*

Plaintiffs' third cause of action asserts that the students had a liberty interest in exercising their first amendment rights through production of the play and that defendants deprived them of this interest without due process of law, because defendants accorded them inadequate notice and an inadequate opportunity to be heard. This theory fails for a number of reasons.

■ First, plaintiffs have waived all due process objections they may have had by their own actions. Plaintiffs' attorney contacted the Board and requested reconsideration of its decision. The Board responded by agreeing to put their motion for reconsideration on the agenda of its next regular meeting and stated that if it did vote to reconsider, plaintiffs would have an opportunity to be heard. The record does not reveal whether plaintiffs attended that meeting, but they did file this suit the same day that the Board responded to their request. Thus, plaintiffs have forgone any due process argument they might have had by failing to wait for either the Board's response or for the meeting at which their motion was to be heard before they asserted their due process claim.

Second, plaintiffs had no entitlement to or legitimate expectancy of participating in the play. At the point when the Board disapproved the play, the play had been selected, but there had been no auditions. These particular student plaintiffs had no legitimate expectation that they would participate, other than their inchoate desire to do so. Because these plaintiffs had no entitlement to participation in the play, they had no entitlement to exercise their first amendment rights through participating in the play; hence, plaintiffs had no liberty interest sufficient to evoke constitutional due process protection. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572–74, 577, 92 S.Ct. 2701, 2706–07, 2708, 33 L.Ed.2d 548 (1972).

Third, the Board did give notice of its special meeting and did accord students and faculty an opportunity to be heard before it voted. Due process only requires that notice be reasonable under the circumstances and that there is an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–29, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982). Although the notice period was short, it was reasonable in light of the desire to have the Board vote before auditions were to be held. Moreover, it was adequate to inform at least some interested students, who appeared and presented their views. Due process does not require that plaintiffs themselves participate in the hearing. *Hartford Consumer Activists Association v. Hausman*, 381 F.Supp. 1275, 1283–84 (D.Conn.1974). To the extent any process was due, we find the Board provided adequate notice and opportunity to be heard under the circumstances.

We find no due process violations in the Board's actions, and grant summary judgment for defendants on the third cause of action.

## CONCLUSION

We find defendants' actions did not violate plaintiffs' first amendment rights.

Plaintiffs failed to present any evidence of a chilling effect and are estopped by their waiver and representations from conducting further discovery to do so. The board did not violate plaintiffs' due process right in the procedure by which it decided to prohibit production of the play. We GRANT defendants' motion for summary judgment, DENY plaintiffs' motion for summary judgment, and direct that JUDGMENT be entered FOR DEFENDANTS on all claims. No costs.