[No. D009704. Fourth Dist., Div. One. May 30, 1990.]

ALAN DiBONA et al., Plaintiffs and Appellants v.
ROBERT L. MATTHEWS et al., Defendants and Respondents.

1330

1332

COUNSEL

Laura Whitcomb Halgren, Lois M. Kosch, Gray, Cary, Ames & Frye and Betty Wheeler for Plaintiffs and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Donal M. Hill, Deputy County Counsel, for Defendants and Respondents.

OPINION

**WIENER, Acting P. J.**—Plaintiffs Alan DiBona and J. Scott Gundlach, a college teacher and student respectively, appeal following the entry of summary judgment in favor of defendants Robert L. Matthews and James Hardison, administrators with the San Diego Community College District. Plaintiffs claim there are issues of fact which remain to be litigated in their claim that defendants violated their constitutional rights by cancelling a drama class because of the subject matter of the play DiBona had selected for the students to perform. We agree and reverse the summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the plaintiffs, the record before the court on the motion for summary judgment reveals the following story. The Educational Cultural Complex (ECC) is a branch of the San Diego Community College District located in Southeast San Diego. ECC offers college and adult education courses. Alan DiBona began teaching at ECC on a part-time basis in the fall of 1985. He taught the Drama 250 course during the fall and spring semesters and was asked to again teach the same course for the summer session. The curriculum for Drama 250 requires that the students produce and perform a play.

Although his formal teaching contract for the summer was not signed until April 1986, DiBona began to prepare for the class in March. He selected a play written by Dennis McIntyre entitled "Split Second." The play concerns a Black New York City police officer who, in the course of a routine arrest of a White suspect, is subjected to a flurry of racial slurs and epithets. In a split-second loss of control, the officer shoots and kills the suspect. He then places a knife in the hand of the victim and fabricates a story that the shooting was in self-defense. According to DiBona, "[t]he play centers around the morality of [the officer's] actions, exploring one man's rationalization of why he should not tell the truth and the repercussions of his decision."

ECC does not require that teachers obtain the approval of the college administration for plays to be performed in drama classes. DiBona nonetheless gave a copy of the script to Sylvia M'Lafi Thompson, the ECC cultural affairs adviser, and discussed the content of the play with defendant Robert Matthews, the ECC president. In late May, DiBona made copies of the play available to students interested in taking the class.

Summer session classes were scheduled to begin at ECC on Monday, June 16. DiBona made special arrangements for the class to begin meeting on Monday, June 9. Over the course of the week auditions were held. By Friday, June 13, DiBona and plaintiff Scott Gundlach—an ECC student and the play's assistant director—had selected and notified the cast. Other students were assigned technical functions such as lighting and costumes.

Approximately 14 students met on Saturday to do an initial read-through of the play. Only two or three were formally enrolled in Drama 250 at that point. The remainder including Gundlach signed "add" cards on Saturday. Defendant James Hardison, the dean of arts and sciences at ECC, conceded it was generally understood that students did not preenroll for drama classes because most preferred to wait for the results of the auditions before deciding whether to take the class. DiBona collected the "add" cards and instructed the students to bring any necessary additional fees to class on Monday.[1] He indicated he would submit everything to the registrar's office on Monday evening.

On Monday morning June 16, Matthews received a call from the past president of ECC informing him that certain church leaders in the community were upset about the "Split Second" play and asking him to look into it. Matthews spoke with DiBona at about 2:30 that afternoon. He explained he had received some phone calls which included "negative remarks about the proposed production" and indicated "there might be some unrest" as a result of the play. Matthews told DiBona he "was not prepared or had no desire to take on our religious community, . . ." At Matthews's request, DiBona provided him with a copy of the play. Matthews quickly skimmed the script, focusing on the first two scenes. He concluded the plot "was weak, and that the language was inappropriate in an educational setting." Meeting with DiBona a few minutes later, Matthews expressed his opinion that "this play would not be produced publicly at [ECC]." He refrained from further comment because he wanted to consult with Dean Hardison.

---

[1] In his deposition, Gundlach explained it was unnecessary for him to pay any additional fees because he was enrolled in other classes and had already paid the maximum fee.

At about 5 p.m. Matthews met with DiBona, Gundlach, and two other students interested in working on the play.[2] Although he had still not read the bulk of the script, Matthews reiterated his concerns with the "community opposition" to the play. According to DiBona, "He told me . . . that he didn't want organized opposition from the ministers of the community and that he was responsible to the community . . . and that he felt that the language was unacceptable for [ECC]." DiBona and the students attempted to explain that while the language in the first scene was strong, it was appropriate given the theme of the entire play. Matthews agreed to read the complete script that night.

The class met as scheduled Monday evening. DiBona and Gundlach briefed the class on their meeting with Matthews, explaining that for the time being, the play was "on hold." DiBona suggested it was pointless to submit the "add" cards and additional fees to the registrar pending resolution of the controversy. The students discussed potential alternatives open to them and whether the administration reaction had been influenced by the Sagon Penn case currently being tried in San Diego County Superior Court.[3]

Sometime on Monday or Tuesday, Matthews asked Hardison to read the play. When they discussed the issue again, they agreed the play was inappropriate for presentation at ECC. Hardison termed the characters "a little weak," the plot "anticlimactic," and concluded "it's not very uplifting." He thought "Split Second" "would [not] fit into the category of . . . Tennessee Williams or any of the [sic] George Bernard Shaw's works, in my opinion. Just is not of that caliber." Matthews suggested that Hardison talk to DiBona.

DiBona spoke with Hardison on Tuesday evening.[4] According to DiBona, "Hardison . . . told me the decision to cancel the class was due to the sensitivity of the community to the subject matter. [He] said perhaps the play would do well in La Jolla, but not in Southeast San Diego. Hardison

---

[2] Coincidentally, one of the two students was Matthews's son, Brian.

[3] Sagon Penn, a young Black man living in Southeast San Diego, was charged with murder and attempted murder in the shootings of two police officers and a civilian ride-along. Penn was stopped by one of the officers for an alleged traffic violation. He admitted shooting the victims using a gun belonging to the officer who originally stopped him. He claimed, however, that the officer used the traffic stop as a pretext to verbally abuse and physically assault him because he was Black. After a hung jury in his first trial, a second jury acquitted Penn of all major charges. Following the second trial, the remaining charges were dismissed. (See generally, e.g., *Jury Acquits Penn in Slaying of S.D. Officer,* Los Angeles Times (S.D. Cty. ed., July 17, 1987) pt. I at p. 1, col. 2.)

[4] DiBona also spoke with Matthews by phone on Tuesday. Having now read the entire play, Matthews stated he continued to object to the language of the script. DiBona suggested modifying some of the objectionable language but Matthews remained unpersuaded.

said the community needed to be uplifted, and suggested the class put on 'The Wiz.'"[5] DiBona declined Hardison's suggestion to use another play, pointing out that he had been preparing "Split Second" for months. He then asked whether it would be possible to conduct the class and perform the play privately so that the students could receive credit. Hardison said he would check with Matthews. The next evening, Hardison told DiBona he and Matthews had decided there would be no class with "Split Second" as the subject matter.

At about this same time, Hardison received a list of classes at ECC with insufficient enrollment. The Drama 250 class was included on this list because only three students were officially registered. As noted previously, due to the controversy over "Split Second" DiBona had never submitted the "add" cards for 11 of the 14 students to the registrar's office. (See *ante*, p. 1335.) Hardison testified it was the "general practice" at ECC to drop classes with less than 10 students. ECC records reflect that Drama 250 was cancelled on Tuesday, June 17. DiBona stated and Hardison confirmed, however, that Hardison never mentioned class enrollment during their discussions. In fact, DiBona never heard the class had been cancelled due to low enrollment until after this litigation began.

After the administration decision was communicated to the students, they decided to rehearse and perform the play off campus. None of the students including Gundlach received course credit, and DiBona was not paid pursuant to his contract for teaching a summer session course.

DiBona and Gundlach filed this action alleging violation of their constitutional rights and seeking declaratory and injunctive relief. At that time, DiBona was no longer a teacher and Gundlach no longer a student at ECC. DiBona, however, was employed as a teacher at the City College campus of the San Diego Community College District. Gundlach was enrolled as a student at the District's Mesa College campus.

Matthews and Hardison moved for summary judgment arguing that the case was moot, that DiBona and Gundlach lacked standing, and that there was no violation of plaintiffs' constitutional rights. The trial court agreed with defendants, reasoning as follows: "[A]fter going through it very carefully, I just feel that the defense position, with regard to the fact that there is

---

[5] "The Wiz," an adaptation based on Frank L. Baum's book The Wonderful Wizard of Oz, was described by one source as "the most successful all-black musical presented in the 1970's." (Laufe, Broadway's Greatest Musicals (1977) p. 425.) Featuring elaborate costumes and a rock music score, the play won the 1975 Tony Award for best musical and spawned a 1978 movie version starring Diana Ross. (Lynch, Musicals! A Directory of Musical Properties Available for Production (1984) p. 168.)

no justiciable issue, is appropriate under these circumstances, that to . . . render an opinion would be contrary to the law's admonition that we not engage in moot acts or advisory opinions.

"I further agree with the position which is espoused in the moving papers . . . that there is no standing with regard to the remaining parties . . . .

"And then, finally, I found the argument persuasive that this really didn't involve a violation or an improper . . . impact on the First Amendment rights of the parties who brought the action."[6]

The court later expanded on its view that the plaintiffs' First Amendment rights had not been affected: ". . . I don't think that there was censorship here. I don't think that there was an improper denial or cancellation of that class. And I do think that what did occur, under these circumstances, most assuredly was reasonable.

"And I think I'm capable of taking a little bit of judicial notice as to what the political atmosphere in Southeast San Diego and in the City of San Diego was at about the time that this arose, with regard to a certain well known and well publicized criminal action that was proceeding through our courts.

"And I think that what happened was that the administration weighed the potential of the harm that could have been caused by that play, the fact that obviously, justifiable or not, there were segments of the society that was going to be exposed to it that had evidenced the fact that they were not very happy with it, that the Saigon [*sic*] Penn situation was a very volatile and potentially violent situation.

"I think all of these things were properly in consideration. I don't view it at all as being a First Amendment matter at all. And, even if it were, I think it's the same situation about the ability to yell, 'Fire' in a crowd of a theater. I think, under those circumstances, calmness and awareness of the problem justified the action that was taken.

"[Plaintiffs' Counsel]: So it is your Honor's feeling that the decision— that the administrators had the discretion to act as they did in order to prevent controversy within the campus or the community.

"THE COURT: Within the community. And bearing in mind what they are. And what the nature of the institution was and the fact that they

---

[6] Commenting on the language in the play, the court added: "And I read the play, by the way. And maybe somebody would have been offended, but having sat nine months in a criminal department—that was everyday testimony."

utilized public monies, the geographic location of it. All of those things, I think, were considerations."

Plaintiffs' counsel then argued that the administrators' actions were invalid because they failed to use objective criteria in deciding whether the play was "appropriate." The court responded: "You see, that's where I part company with your reasoning. I think they did act in an objective, competent manner. I think to have done otherwise, to say, 'Oh, good heavens. We've got First Amendment rights we have to be aware of' and let them put it on and let the devil take the hindmost would have been unconscionable, under the circumstances.

"I think they did act in a fair and objective way in how they arrived at their determination. Under the circumstances and facts that existed at this time, this play was not an appropriate one to be placed in the public purview."

## DISCUSSION

County Counsel on behalf of the defendant college administrators seeks to defend the court's grant of summary judgment on the same three theories raised and relied on below. We address these arguments seriatim.

*Standing*

 Defendants argue that the case is not justiciable because neither DiBona nor Gundlach has standing to assert a violation of their free speech rights under the United States and California Constitutions. The contention need not detain us long. As the court explained in *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16 [61 Cal.Rptr. 618], "One who invokes the judicial process does not have 'standing' if he . . . does not have a real interest in the ultimate adjudication because the actor has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*Id.* at pp. 22-23.)

 In a controversy of this nature, it is difficult to conceive of persons who could more properly present the relevant facts and argue the relevant issues than the teacher who was prevented from teaching the class and a student who was precluded from taking it. Here, DiBona suffered actual injury because defendants' actions allegedly denied him both the monetary benefits of his teaching contract with the community college district and the ability to select the course of instruction for the class. (See *post,* fn. 7.) Defendants assert Gundlach lacks standing because he was never officially

enrolled in the class. The facts are at least susceptible of the interpretation, however, that Gundlach would have been enrolled but for the allegedly unconstitutional acts by the defendants. Under these circumstances, the issue is not one of standing; Gundlach has a sufficiently personal interest at issue to properly present the case. The question is simply whether Gundlach can prove the causal link necessary to establish his entitlement to relief.

*Mootness*

■ The second arrow in defendants' justiciability quiver is their argument that the case is moot because the 1986 summer session has long since ended, neither DiBona nor Gundlach continues to be associated with ECC, and the trial court was without power to grant any form of relief even were it determined the defendants acted unconstitutionally. Defendants ignore the fact that Gundlach continues to seek academic credit for having completed the Drama 250 course. DiBona stated that the production of "Split Second" which the students staged off campus would have fully satisfied the course requirements had it been performed at ECC. As we have explained, the mere fact that Gundlach was never formally enrolled in the course does not necessarily preclude his obtaining relief. If Gundlach can show he satisfied all the course requirements for Drama 250 except those made impossible by defendants, the court could properly conclude that course credit should be awarded and order appropriate declaratory and injunctive relief.

Even were the award of course credit inappropriate, an exception to the mootness doctrine exists where the issue is "capable of repetition, yet evading review." (*Southern Pacific Terminal Co.* v. *ICC* (1911) 219 U.S. 498, 515 [55 L.Ed. 310, 316, 31 S.Ct. 279].) Defendants impliedly concede the three-month-long summer session is sufficiently short that absent application of such an exception, defendants' actions would evade considered appellate review. (See *Roe* v. *Wade* (1973) 410 U.S. 113, 125 [35 L.Ed.2d 147, 161, 93 S.Ct. 705]; *Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555, 563 [65 L.Ed.2d 973, 981, 100 S.Ct. 2814] (plur. opn.).) They contend, however, there is no "reasonable expectation that the same complaining party [will] be subjected to the same action again." (*Weinstein* v. *Bradford* (1975) 423 U.S. 147, 149 [46 L.Ed.2d 350, 353, 96 S.Ct. 347].)

The argument misperceives the degree of certainty necessary to invoke the exception. Here, DiBona continues to teach drama and Gundlach continues to be enrolled as a student in the San Diego Community College District. While they are now not teaching or studying at the District's ECC location, we think such a requirement would be unnecessarily restrictive. DiBona may again teach or Gundlach may again take classes at ECC.

Moreover, although defendants were administrators at ECC at the time the lawsuit was filed, they have since been moved to other positions within the district. Because defendants are *district* employees, we assume any relief of a declaratory nature granted to plaintiffs here will inure to the benefit of all the district's teachers and students.[7] Finally, were it critical to the maintenance of the lawsuit, plaintiffs should be given the opportunity to amend their complaint to add the district as an additional defendant.

*Constitutional Issues*

Having disposed of the alleged procedural barriers, we now confront the fundamental question whether the evidence before the court on defendants' motion for summary judgment establishes as a matter of law that plaintiffs' constitutional rights were not violated. ■ Defendants first argue the evidence establishes the class was cancelled for reasons unrelated to First Amendment concerns. They assert it is uncontested Hardison authorized and Matthews approved the cancellation on June 17 because of low enrollment.[8] This argument misconstrues the central issue. The record reflects that beginning on June 16, Matthews and Hardison expressed their opinions that "Split Second" would not be performed at ECC. While it is true only three students were formally enrolled on June 17, it is equally clear that eleven other students wanted to enroll and would have enrolled had defendants not acted to prohibit performance of the play. Under these circumstances, it cannot be said that the cancellation of the class was unrelated to

---

[7] DiBona has not attempted to join a breach of contract claim with the request for declaratory relief. Relying on *Bachis* v. *State Farm Mutual Auto. Ins. Co.* (1968) 265 Cal.App.2d 722 [71 Cal.Rptr. 486], defendants contend declaratory relief as to DiBona is improper because he possesses a "fully matured cause of action for damages . . . and . . . no declaration concerning future rights and duties is necessary, proper or even possible . . . ." (*Id.* at p. 723.) They further assert that amendment of the complaint would be improper because DiBona failed to comply with the one-year claim filing requirement of Government Code section 911.2. (See *Loehr* v. *Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071 [195 Cal.Rptr. 576].)

Because there is no breach of contract action before us, we have no occasion or basis to comment on the applicability of the claim requirement or whether it may be excused. Assuming, however, that DiBona is unable or unwilling to pursue his contractual rights, he may still benefit from a declaration of his rights with regard to the selection of material to be performed in drama classes in the San Diego Community College District because he continues to be employed by the District as a drama instructor. Accordingly, the issues are not moot as to DiBona.

[8] While ECC records indicate the class was cancelled on Tuesday the 17th, the dates are not completely certain. It appears that as late as Tuesday evening, DiBona and Hardison were still discussing alternatives to a public performance of "Split Second." It was not until Wednesday that DiBona was notified there would be no drama class with "Split Second" as its subject. (See *ante*, p. 1336.) In addition, Matthews acknowledged that classes cancelled due to low enrollment could be reinstated if it became clear that a sufficient number of students wished to add the course.

the content of the play and plaintiffs' attempted exercise of their constitutional rights in performing it.

Of course, the mere fact that defendants considered the content of the play in deciding to cancel the class does not in itself establish a violation of plaintiffs' constitutional rights.[9] ■ Under the guise of free speech, the First Amendment does not transfer control of a public school's curriculum from school administrators to individual teachers and students. Equally important, however, "[n]either teachers [n]or students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 506 [21 L.Ed.2d 731, 737, 89 S.Ct. 733].) As with so many First Amendment issues, the question is one of identifying permissible governmental purposes and balancing the competing interests. To paraphrase the Supreme Court in *Tinker,* our problem lies in the area where the exercise of First Amendment rights by students and teachers collides with the discretion of school administrators in deciding what is appropriate instructional material. (*Id.* at p. 507 [21 L.Ed. 2d at p. 738].)

The facts before the court on the motion for summary judgment[10] suggest three principal reasons for the cancellation of the class articulated by Matthews and Hardison at various points in time: (1) there was opposition to the play from the religious community; (2) the subject matter of the play was sensitive given the community unrest in the wake of the Sagon Penn trial; and (3) the language of the play was "inappropriate."[11]

---

[9] Although raised as an issue by plaintiffs, we have not found it helpful to characterize this case as one involving an attempt by government to regulate the content of presentations in a public forum. (See generally, e.g., *Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45-46 [74 L.Ed.2d 794, 804-805, 103 S.Ct. 948].) As we read the record, defendants' objection was not to the performance of "Split Second" at the ECC theater but rather to its production as part of the curriculum in an ECC drama class. Likewise, plaintiffs are complaining not because they could not perform the play—clearly they did perform it at an alternate location. They are seeking, in Gundlach's case, credit for having completed the class and in DiBona's case, a basis to claim entitlement to agreed-upon salary for the 1986 summer session.

[10] The record before us is not the typical record we see following a court's decision to grant summary judgment. In addition to declarations supporting each side's submissions, we have the full text depositions of each of the four principals: DiBona, Gundlach, Matthews and Hardison. It is thus tempting to assume that the record following a full trial would not be dissimilar to that before us now.

With this in mind, it is important to recognize that plaintiffs filed no cross-motion for summary judgment and the question before us is limited to deciding whether there are issues of fact which remain to be litigated. We answer this question in the affirmative. For the guidance of the trial court on remand, we have on occasion commented on the state of the factual record before us assuming that a full trial will not result in substantial changes. These comments should in no way be taken as an expression of opinion on the outcome of the case should the evidence at trial prove to be significantly different.

[11] Matthews and Hardison also criticized the play because it was not "uplifting" and because the plot and characters were "weak." (See *ante,* pp. 1334, 1335.) We do not read the

## A

■ Plaintiffs contend the first and second justifications were the "real" reasons for cancellation of the class. The sequence of events would certainly support such a conclusion since Matthews admitted it was a phone call regarding opposition from religious groups which triggered his initial inquiries of DiBona. Moreover, the trial judge specifically accepted the pending Penn criminal case as a valid reason justifying ECC's caution in producing a play raising similar issues.

Both the United States and California Supreme Courts have spoken to the question of whether government may regulate the content of speech because of concern that it may provoke dissension, dispute or disturbance. More than 40 years ago in *Terminiello* v. *Chicago* (1949) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894], Justice Douglas wrote: "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound and unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, [citation], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." (*Id.* at p. 4 [93 L.Ed. at p. 1134].)

Twenty years later in *Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, Justice Fortas repeated *Terminiello*'s rationale in rejecting a school district's argument that the wearing of black armbands by some students might provoke a disturbance: "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom

record to suggest that defendants believed the class could be cancelled because the play was insufficiently optimistic. To use Hardison's own frame of reference (*ante*, p. 1335), the plays of Tennessee Williams would have difficulty qualifying if "uplifting" were a necessary prerequisite.

As to the strength of the plot and characters, no one would question the authority of teachers and administrators, in selecting plays to be performed or books to be read, to evaluate the literary quality of the work being considered. Here, however, as in virtually all college-level settings, the administration had delegated to the faculty member the authority to evaluate literary quality and select a play. ECC had no policy requiring or even allowing for the submission and review of materials before they were used in class. Moreover, Matthews and Hardison could point to no objective criteria they looked to in assessing the play's literary value. (See *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 284 [50 L.Ed.2d 471, 482, 97 S.Ct. 568].) Significantly, DiBona was never told the play was unacceptable because it possessed insufficient literary value. This record provides no basis for concluding as a matter of law that the class was cancelled because of the quality of the play.

of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk [citation]; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." (*Id.* at pp. 508-509 [21 L.Ed. 2d at p. 739].)

Because it concerned conduct on a state college campus, the California Supreme Court's opinion in *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138 [109 Cal.Rptr. 897, 514 P.2d 697] is of particular interest. Writing for the court, Justice Tobriner echoed themes similar to those articulated in *Terminiello* and *Tinker*: "[N]either the 'content' of speech nor freedom of association can be restricted merely because such expression or association disrupts the tranquility of a campus or offends the tastes of school administrators or the public. Protest may disrupt the placidity of the vacant mind just as a stone dropped in a still pool may disturb the tranquility of the surface waters, but the courts have never held such 'disruption' falls outside the boundaries of the First Amendment." (*Id.* at p. 146.)

The facts of this case present a classic illustration of "undifferentiated fear" of disturbance on the part of school administrators. DiBona was given the authority to select curriculum materials. The administration became interested in the subject matter of the class only after "community" opposition was first manifest. When they reacted to this pressure by cancelling the class, there were no facts known to either Matthews or Hardison indicating a "clear and present danger" of any evil, let alone a "serious substantive" one. Nor was there any suggestion that the production of the play would " 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school', . . ." (*Tinker, supra,* 393 U.S. at p. 509 [21 L.Ed. 2d at p. 739], quoting *Burnside* v. *Byers* (5th Cir. 1966) 363 F.2d 744, 749.) Rather, school officials were merely concerned with "avoid[ing] the discomfort and unpleasantness that always accompany" an unpopular or unorthodox point of view. (*Tinker, supra,* 393 U.S. at p. 509 [21 L.Ed. 2d at p. 739].)

Similar issues were similarly resolved in *Brown* v. *Board of Regents of University of Nebraska* (D.Neb. 1986) 640 F.Supp. 674. There, the University of Nebraska cancelled the scheduled showing of a controversial film, "Hail Mary," after several members of the public and a state senator complained that the film blasphemed certain religious beliefs. The director of the campus art gallery (within which the theatre showing the film was

housed) ordered cancellation of the film because it was " 'offensive to a segment of society and did not merit the efforts it would take to defend it.' " (*Id.* at p. 677.) The director was also concerned that the negative publicity concerning the film would adversely affect the university's and the gallery's ongoing budgetary battles in the Legislature. (*Ibid.*) In a suit for declaratory relief, the district court relied on *Tinker* in holding that the decision to cancel the film violated the constitutional rights of persons wishing to view it. "It was not the fact of controversy that caused the cancellation of 'Hail Mary'. It was that the prospect of a religious battle in the uneasy political setting of the time . . . threatened the peace and stability of the Sheldon Gallery. Even if the cause had been only the fact of controversy, however, cancellation would not have been justified, because action taken by an arm of the state merely to avoid controversy from the expression of ideas is an insufficient basis for interfering with the right to receive information." (*Id.* at p. 679.)

Here, Matthews's expressed desire to avoid "taking on" the religious community is clearly an insufficient basis for cancellation of the class. As to the "politically sensitive" nature of the play's subject matter, not only is it a constitutionally inappropriate reason for censorship, ultimately it may also be counterproductive for the community. A central premise of the constitutional guaranty of free speech is that difficult and sensitive political issues generally benefit from constructive dialogue of the sort which might have been generated by "Split Second."

B

██ Defendants suggest their decision may be upheld and the summary judgment affirmed based on the independent ground that the language used in "Split Second" was "inappropriate" for a school play. ██ While it is clear the trial court did not rely on this ground (*ante,* fn. 6), our obligation is equally clear to affirm the judgment if there is an adequate independent basis which establishes as a matter of law that defendants must prevail. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)[12]

██ We have previously alluded to the fact that school administrators possess considerable discretion in deciding on the content of school curriculum. (See, e.g., *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260,

[12] Although we conclude defendants' proffered justification regarding the play's indecent language is also an insufficient basis to support censorship, we note that it is at least a question of fact as to what was defendants' true motivation in canceling the class. (See *Board of Education* v. *Pico* (1982) 457 U.S. 853, 883 [73 L.Ed.2d 435, 457, 102 S.Ct. 2799] (conc. opn. of White, J.).)

273 [98 L.Ed.2d 592, 606-607, 108 S.Ct. 562]; *Epperson* v. *Arkansas* (1968) 393 U.S. 97, 104 [21 L.Ed.2d 228, 234, 89 S.Ct. 266].) The appropriateness of language used in a play has—at least in certain contexts—traditionally been viewed as the sort of factor which may legitimately be considered in making curriculum decisions. For varying reasons, however, we conclude it cannot support defendants' decision to cancel the Drama 250 class and prohibit the performance of "Split Second."

Numerous cases have considered the question under what circumstances school officials may regulate the performance of dramatic productions or the availability of written materials on grounds of inappropriate language or content. Nearly all these cases, however, have involved minors rather than adult college students.[13] For instance, in *Board of Education* v. *Pico, supra,* 457 U.S. 853, the Supreme Court approved reversal of a summary judgment entered in favor of a school board which decided to remove certain books from a junior high and high school library, allegedly because of vulgarity and sexually explicit language. Although the splintered nature of the opinions in the case makes an express holding somewhat difficult to discern, several of the dissenting opinions are explicitly or implicitly premised on the students' status as minors. (*Id.* at p. 893 [73 L.Ed. 2d at p. 464], dis. opn. of Burger, C. J. ("teenage pupils"); p. 897 [73 L.Ed. 2d at p. 466], dis. opn. of Powell, J. ("I certainly would not *require* a school board to . . . teach such values to *children*"); p. 920 [73 L.Ed.2d at p. 480], dis. opn. of Rehnquist, J. ("[T]he government as educator is subject to fewer strictures when operating an elementary and secondary school system than when operating an institution of higher learning").)

Similarly in *Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675 [92 L.Ed.2d 549, 106 S.Ct. 3159], the court approved the imposition of discipline on a high school student for utilizing an explicit sexual metaphor in a speech to fellow students at a school assembly. More recently in *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, a high school principal's decision to remove two articles from a student newspaper was upheld based on his conclusion that the privacy interests of students alluded to in an article on teen pregnancy were inadequately protected and because a person criticized in an article on divorce was given no opportunity to respond. (*Id.* at pp. 274-276 [98 L.Ed. 2d at pp. 607-608].) In reaching its conclusion, the court suggested that teachers and administrators have more discretion in regulating the content of *school-sponsored* expressive activity so long as the regulation is "reasonably related to legitimate pedagogical concerns." (*Id.* at p. 273 [98 L.Ed. 2d at p. 606]; see also *Seyfried* v. *Walton* (3d Cir. 1981)

---

[13] In *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, the court expressly reserved the question of the extent to which the content of college-level expressive activities could be regulated by school officials. (*Id.* at p. 274, fn. 7 [98 L.Ed. 2d at p. 607].)

668 F.2d 214 (approving school superintendent's decision to prohibit performance of high school play because of sexual content); *Bell* v. *U-32 Bd. of Educ.* (D.Vt. 1986) 630 F.Supp. 939 (upholding school board's decision not to produce high school play dealing with violence, sexual activity, and drug and alcohol abuse).)

Defendants contend as college administrators they should be afforded the same broad discretion in controlling their curriculum as school administrators at the elementary and secondary level. ■ As a general proposition, however, where children are concerned the legitimate role of the government in regulating speech is substantially broader. (See, e.g., *Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274] (government may prohibit the sale to minors of sexually explicit material which would be constitutionally protected if sold to adults); see also *FCC* v. *Pacifica Foundation* (1978) 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026].) In contrast, as the Supreme Court explained in *Healy* v. *James* (1972) 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338], "[T]he precedents of this Court leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." (*Id.* at p. 180 [33 L.Ed.2d at p. 279].) In *Papish* v. *University of Missouri Curators* (1973) 410 U.S. 667 [35 L.Ed.2d 618, 93 S.Ct. 1197] the court considered the question whether a student could be disciplined for distributing a newspaper on campus containing "indecent" language and material. In a per curiam opinion, the court invalidated the student's expulsion explaining, "We think *Healy* makes it clear that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" (*Id.* at p. 670 [35 L.Ed.2d at p. 622].)

■ Relying principally on *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, defendants suggest that the broad pronouncements of *Healy* and *Papish* have been undercut by more recent decisions recognizing an enhanced governmental interest in regulating *school-sponsored* expressive activities such as the play in this case. They suggest this more deferential standard is equally applicable in the college and adult education context.

We question whether the rationale underlying the "school sponsorship" rule would allow its wholesale extension to educational settings involving adults. The general public is likely to view school-sponsored student speech as bearing the "imprimatur of the school" (*Hazelwood, supra,* 484 U.S. at p. 271 [98 L.Ed. 2d at p. 605]) largely because of the greater control elementary and secondary schools exercise over the conduct of minor students. Defendants have cited no authority—and we are aware of none—which would allow a college or university to censor instructor-selected curriculum

materials because they contain "indecent" language or deal with "offensive" topics.

Moreover, there was no danger anyone likely to be offended would be forced to participate in or view the play. DiBona made the script available to students several weeks before the first class so they could decide whether they wished to audition. Assuming the play was performed publicly, no one would have been required to attend.[14]

In any event, we may assume school sponsorship is a factor which under some circumstances can be considered at the college level. We nonetheless cannot validate defendants' decision here to cancel the Drama 250 class. Although *Hazelwood* mentions a school's production of a play as the type of expressive activity which may be viewed as "sponsored" (484 U.S. at p. 271 [98 L.Ed.2d at p. 605].), one can produce a play without advocating or subscribing to every idea the author of the play intends to communicate. No one could reasonably argue that a school which presented a play by Shakespeare was thereby advocating the social and sexual mores of 17th century England which are implicit and often explicit in Shakespeare's works. Moreover, defendants' objection here was based on the indecency of the language used in "Split Second," particularly its first scene.[15] But in contrast to a school paper—which if it allowed students to express themselves using profanity would implicitly condone its use—"Split Second" does not advocate the use of vulgar speech. If anything, the play suggests that the use of profanity and racial slurs may cause people to react emotionally rather than rationally. As the trial court in this case recognized, profane speech is unfortunately the accepted vocabulary of some segments of our society. (*Ante,* fn. 6.) "Split Second" simply recognizes this reality and uses it to create the emotional tension necessary to develop the moral and philosophical issues which are central to the play.

Our conclusions do not leave college administrators powerless to control college curriculum. Although the "legitimate pedagogical concerns" at the college and university level may be more limited than in elementary and secondary schools, they are not nonexistent. ██ Certainly college

[14] In *Piarowski* v. *Illinois Community College* (7th Cir. 1985) 759 F.2d 625, the court upheld a college's decision to remove certain sexually graphic artwork from a display on a central campus mall and place it instead in a less conspicuous location. Interestingly, the court assumed the college could not constitutionally prohibit the display of the art on campus (*id.* at p. 630) but it concluded the college was not obligated to subject unwitting passers-by to expressive displays some might find offensive under circumstances which might imply college approval. (*Ibid.*) Here, of course, defendants rejected a proposal by plaintiffs to offer only a private performance of the play to which the general public would be denied access. (*Ante,* p. 1336.)

[15] Defendants inform us that "[i]n the first eleven pages of the script . . . , more than 40 vulgar and profane words are used."

officials may limit the drama curriculum to works of an acceptable literary quality and they undoubtedly are entitled to broad deference where such determinations are made in advance rather than, as here, some time after the class had already begun to meet.

At least where adults are concerned, however, literary quality cannot be measured simply by counting the number of "indecent" words in a book or play. (See *ante*, fn. 15.) As Justice Harlan recognized in *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780], taking a page from McLuhan, no bright line can be drawn between the manner of communication and the content of the ideas communicated. "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able . . . to discern little social benefit that might result from running the risk of opening the door to such grave results." (*Id.* at p. 26 [29 L.Ed.2d at p. 294].)

## DISPOSITION

Judgment reversed.

Work, J., concurred.

**HUFFMAN, J.,** Dissenting.—This case presents the question of who should control the curriculum of an educational institution—the administration, the faculty, or the students. Unfortunately, although it disclaims such result, the majority answers the question by permitting the faculty and students to determine curriculum content. To the extent any administration control will remain, it will have to be pursuant to "objective standards" which will lead to court supervision. To reach this unhappy result, the majority opinion has struggled to attempt to overcome the lack of standing of appellant Scott Gundlach and the mootness of the declaratory relief claim of appellant Alan DiBona.

I believe the majority opinion, although scholarly and well written, is truly "advisory" because neither injunctive nor declaratory relief is appropriate to these parties whose relationship with the defendants was severed four years ago. Moreover, the advice it renders is at odds with recent United States Supreme Court authority regarding the power of school administrators to control curriculum content.

## Mootness

The "collision" of the respective interests of these parties occurred during the summer of 1986, when DiBona was preparing to offer a class entitled "Drama 250" at the Educational Cultural Complex (ECC), a branch of the San Diego Community College District. As we know, Drama 250 was cancelled, having an official enrollment of only three students, and the play was not produced at the ECC. DiBona, although a teacher in the San Diego Community College system, was not a teacher at the ECC at the time of filing this action and the record does not indicate he is ever likely to return to that facility. DiBona was not punished or disciplined for his participation in the aborted effort to produce the play "Split Second," nor has the ECC declared a policy of "censorship." Therefore, in order to determine whether there is a current controversy between DiBona and the defendants, we must examine the relief sought by the complaint.

The complaint seeks declaratory and injunctive relief. It is not a suit for breach of contract, nor does the record reveal DiBona has ever filed a claim with the college system for wages he would have been entitled to had he taught the class at the college.[1] The purpose of declaratory relief is to resolve uncertainties and controversies which might result in future litigation. It operates prospectively and does not serve merely to redress past wrongs. (*Interstate Marina Development Co.* v. *County of Los Angeles* (1984) 155 Cal.App.3d 435, 443 [202 Cal.Rptr. 377].) Declaratory relief is, rather, an action to declare rights and not an action to execute them. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 848 [92 Cal.Rptr. 179, 479 P.2d 379]; *Bachis* v. *State Farm Mutual Auto. Ins. Co.* (1968) 265 Cal.App.2d 722, 727 [71 Cal.Rptr. 486].) In short, declaratory relief actions should relate to controversies which are subject to a specific and conclusive remedy and should not be used for the purpose of advisory opinions or scholarly works based upon hypothetical facts. (*Zetterberg* v. *State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 661 [118 Cal.Rptr. 100].)

The summer of 1986 has come and gone. The play "Split Second," for whatever literary and social value it has, was performed by DiBona, Gundlach and their colleagues in a public setting. Neither DiBona nor Gundlach is involved with the ECC, Matthews or Hardison, *the entity and persons*

---

[1] As pointed out in the majority opinion, the play "Split Second" was produced by DiBona and members of his class at a different institution during the summer of 1986. (Maj. opn., *ante*, p. 1336.) The class was never authorized by the San Diego Community College, nor were any of the members of the class ever enrolled in or approved for courses outside of the college system. The majority recognizes there is no contract action before the court with regard to DiBona's lost wages and such claim therefore cannot be the basis for overcoming the defense of "mootness." (Maj. opn., *ante*, p. 1340, fn. 7.)

*designated as defendants in this action.*[2] There is, therefore, no controversy now remaining between DiBona and ECC, Hardison or Matthews warranting a "declaration of rights." A ringing defense of First Amendment liberties, no matter how satisfying, should in my humble opinion be reserved for matters of actual controversy. Inevitably, the results of a ruling as offered in this case force changes in respective responsibilities between people in real life and should therefore be declared only in real life controversies. We should not ignore general principles which require courts to decide cases and controversies in order to achieve results deemed to be desirable.

As to DiBona's and Gundlach's request for injunctive relief, similar considerations apply because of events which have transpired. Ordinarily, injunctive relief is available to prevent threatened injury and is not a remedy designed to right completed wrongs. (*Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 372 [122 Cal.Rptr. 732].) Unless there is a showing that the challenged action is being continued or repeated, an injunction should be denied. Moreover, absent extraordinary circumstances, injunctive relief should not be granted where the events have rendered such relief unnecessary or ineffectual. (*Paul* v. *Milk Depots. Inc.* (1964) 62 Cal.2d 129, 132-133 [41 Cal.Rptr. 468, 396 P.2d 924].) Whether the issue presented by this complaint will ever arise again is highly speculative. Under these circumstances, the court should not intervene to exercise its injunctive powers. At minimum, there should be a showing of reasonable certainty that the acts complained of are either continuing or likely to be repeated before such judicial intervention is warranted. (*Gold* v. *Los Angeles Democratic League, supra*, 49 Cal.App.3d at p. 372.)

When DiBona and Gundlach unsuccessfully sought injunctive relief in 1986, they petitioned this court for a writ of supersedeas. We denied their request. They then appealed the denial of the preliminary injunction, but abandoned that appeal on August 29, 1986. Now, four years after the events, with the parties having no relationship to each other and with no indication of any practice, policy or procedure at the ECC that could in any way be deemed censorship, the majority sends this case back to the trial court to declare the rights of the parties and to grant or deny injunctive relief. The time has passed for such relief and the remedies sought should

---

[2] The majority opinion relies in part on the relationship of DiBona and Gundlach to the District as teacher and student at branches other than ECC to support its rejection of mootness. However, the District is not a defendant in this action and there is absolutely no evidence in the record to show the actions in issue here represent any policy or practice of the District. Nor is there the slightest hint in this record of any possible reoccurrence of the peculiar events of this case at some other District facility. In fact, the record demonstrates Mesa College furnished equipment for the performance of the play which was held at a private facility.

not be stretched in order to provide the vehicle for a judicial restructuring of the division of responsibilities within the school system.[3]

## STANDING

Gundlach contends he has standing to pursue declaratory and injunctive relief because, he claims, he is entitled to college credits for the course in which he was never enrolled and which was never conducted at the college. The majority opinion reaches out to establish standing for Gundlach, stating: "The facts are at least susceptible of the interpretation, however, that Gundlach would have been enrolled but for the allegedly unconstitutional acts by the defendants." (Maj. opn., *ante*, p. 1339.) The majority further states "the mere fact that Gundlach was never formally enrolled in the course does not necessarily preclude his obtaining relief. If Gundlach can show he satisfied all the course requirements for Drama 250 except those made impossible by defendants, the court could properly conclude that course credit should be awarded and order appropriate declaratory and injunctive relief." (Maj. opn., *ante*, p. 1339.) Respectfully, such relief seeks neither a declaration of rights nor an injunction, but a retrospective remedy that compels a school to grant credit for a class allegedly completed four years ago. I confess I am astonished at the notion a court could grant credit to a student for a class never conducted, in which he was never enrolled. Surely, an academic institution which is partially funded based on "official" enrollment, and charged with supervising its classes, should not, by judicial fiat, be required to give academic credit for a rump session of an unauthorized class conducted under unknown circumstances. Such judicial power, if it existed, would be truly awesome.

I submit the majority, feeling strongly about the First Amendment issues raised by this appeal, has chosen to ignore legitimate concerns of the absence of standing and justiciable issues in order to make a policy declaration. In my view, policy declarations ordinarily come from the executive and the legislative branches. Under our tripartite system of government, the judicial branch can make policy declarations only when there is an actual case in controversy brought by parties who have standing. I would not reach the First Amendment issues in this case and would affirm the judgment of the trial court on procedural grounds.

---

[3] The majority opinion, recognizing the weakness of its position in this regard, states appellants should be allowed to amend their complaint if necessary to add the District as a defendant. (Maj. opn., *ante*, p. 1340.) Aside from the fact appellants since 1986 have never made such a request, their record contains not the slightest hint of facts to support such an amendment. Nor was the trial court required to "cure" their complaint for them.

## CONSTITUTIONAL ISSUES

Recognizing as I do the dissenter's lot of crying out against the inevitable, I turn then to a discussion of the First Amendment issues.

The majority opinion gives a passing nod to the right of school administrators to control curriculum when it says, "Under the guise of free speech, the First Amendment does not transfer control of a public school's curriculum from school administrators to individual teachers and students." (Maj. opn., *ante*, p. 1341.) The opinion then proceeds to redefine that right of control in instances where the legitimate interests of the school administration "collide" with the claimed First Amendment rights of teachers and students. In truth, the majority strikes a serious blow to the ability of school administrators to set and control curriculum content.

The majority opinion relies heavily on the case of *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]. There the court interpreted the First Amendment rights of students who had sought to wear black armbands on school grounds in order to protest the war in Vietnam. The majority of the court balanced the rights of the students on these facts against those interests of the school administration and held the rights of the students to be superior. The court found no compelling interest on the part of the school to justify limiting the expressive rights of these students. It seems clear to me *Tinker* dealt with a far different and less compelling set of interests on the part of the school administration than the facts in this case. Nor do I believe the reasoning of the majority in *Tinker,* which has been severely undercut by more recent United States Supreme Court case law, compels the result advocated by the majority here.

The majority's analysis of the actions by the ECC administration in this case includes a characterization of the reasons its officials offered to support their conduct in cancelling the class: "(1) there was opposition to the play from the religious community; (2) the subject matter of the play was sensitive given the community unrest in the wake of the Sagon Penn trial; and (3) the language of the play was 'inappropriate.' " (Maj. opn., *ante*, p. 1341.) Thus, the majority's focus rests largely on the concerns of ECC administrators for the effects of the play "Split Second" on the community in which the ECC is located and on ECC's relationship with the people it seeks to serve. Those concerns are dismissed, however, with the statement the school administrators had only an " 'undifferentiated fear' of disturbance" because they knew no facts "indicating a 'clear and present danger' of any evil, let alone a 'serious substantive' one." (Maj. opn., *ante*, p. 1343.)

I respectfully disagree with this somewhat cavalier dismissal of what the trial court found and, I believe to be, legitimate concerns of a community

college branch. Further, I believe the majority implies that any curriculum content regulation based upon the impact on the school and the community in such a circumstance must rise to the level of "clear and present danger." In other words, according to the majority only concerns amounting to a cry of "Fire" in a crowded theatre permit action by school administrators.

The majority's analysis is at distinct odds with the United States Supreme Court holding in *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562]. In *Hazelwood,* a high school had prevented publication of two articles in its newspaper prepared by the school's journalism class. The school's principal objected to the articles dealing with pregnancy and divorce because of their potential impact on the students and, although there had been some editing of one article unknown to the principal, the students were not permitted to publish them. In ruling in favor of the students, the Court of Appeals for the Eighth Circuit had relied on *Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, to hold the school newspaper was a public forum in addition to being part of the curriculum and thus the evidence was insufficient to support the principal's concerns of disruption.

In a six-to-three opinion authored by Justice White, the Supreme Court extensively examined the rights of both students and school administrators. The court noted that the school newspaper (like the production of a play here) was supported principally by school funds. Although some small portion of the cost was recouped, the school was ultimately responsible for this paper's publication. The court pointed out that schools do not possess all the attributes of a public forum and, where the activities may be fairly characterized as part of the school curriculum, the administration has a good deal of authority over "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. at p. 271 [98 L.Ed. 2d at p. 605].) In a statement particularly significant to this case, the court commented: "Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence, a school may in its capacity as publisher of a school newspaper or producer of a school play 'disassociate itself,' [*Bethel School District No. 403* v.] *Fraser,* 478 U.S., at 685, not only from speech that would 'substantially interfere with [its] work . . . or impinge upon the rights of other students,' *Tinker,* 393 U.S., at 509, but also from speech that is, for example, ungrammatical, poorly written, inadequately researched,

biased or prejudiced, vulgar or profane, or unsuitable for immature audiences. A school must be able to set high standards for the student speech that is disseminated under its auspices—standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the 'real' world—and may refuse to disseminate student speech that does not meet those standards. . . ." (*Hazelwood School District* v. *Kuhlmeier, supra*, 484 U.S. at pp. 271-272 [98 L.Ed 2d at pp. 605-606], fn. omitted.)

Thus, in my view, *Hazelwood* clearly authorizes the kind of action taken by school administrators in this case.

The majority opinion seeks to distinguish *Hazelwood* principally because it dealt with high school students and, after all, the ECC is a community *college* branch.[4] I submit the majority's attempt to distinguish a clear analysis of the relationship between administrators and students is overly facile. A reading of *Hazelwood* shows the court was concerned with returning discretion to school administrators when dealing with curriculum, particularly where, as here, the school would have to sponsor, promote, advertise, and financially support the "publication."[5]

The Supreme Court made clear in *Hazelwood* that the concern of the "imprimatur of the school" is a legitimate one that needs to be addressed by those persons who must make the daily decisions for the school and who are held accountable for them. To substitute the judgment of an appellate court made after lengthy contemplation and reflection for that of school administrators in a community already wracked by racial tension between the police and the members of that community is, in my opinion, simply inappropriate.[6] That a judge, years later, may feel these concerns are "no big deal" does not erase the legitimate contemporaneous perceptions of school administrators who, under these facts, cannot be accused of acting other than in a sincere effort to carry out what they thought to be the best interests of the school.

---

[4] Indeed, the Supreme Court reserved the question of the extent of the applicability of its opinion to college settings as one would expect it to do when dealing with a case in controversy arising from a high school.

[5] Interestingly, the majority opinion rejects the sponsorship concerns of ECC administrators when it questions "whether the rationale underlying the 'school sponsorship' rule would allow its wholesale extension to educational settings involving adults. The general public is likely to view school-sponsored student speech as bearing the 'imprimatur of the school' (*Hazelwood, supra*, 484 U.S. at p. 271 [98 L.Ed.2d at p. 605]) largely because of the greater control elementary and secondary schools exercise over the conduct of minor students." (Maj. opn., *ante*, p. 1346.) However strongly the majority may feel on this issue, there is neither factual nor legal support in this record for such speculation.

[6] As acknowledged by the majority, the murder trial of Sagon Penn had only recently concluded before these events and the administrators of that community-based college were apparently exquisitely aware of the anguish that case and the police relationship to the minority community had produced.

Before *Hazelwood* was decided, the Court of Appeals for the Third Circuit in *Seyfried* v. *Walton* (3d Cir. 1981) 668 F.2d 214, 216-217, considered the question of school sponsorship as a factor bearing on the ability to control expressive productions. The issue there was whether the school superintendent could cancel a high school production of the musical "Pippin" based upon inappropriate sexual content. Although the script had been edited to remove a good deal of the explicit sexual language, the school superintendent deemed the play inappropriate for production in a high school setting. The Third Circuit analyzed the First Amendment in light of the special circumstances of the school environment. Based upon its analysis of *Tinker* and *Epperson* v. *Arkansas* (1968) 393 U.S. 97 [21 L.Ed.2d 228, 89 S.Ct. 266], the court concluded the implication of school sponsorship from the authorized production of the play could be viewed as an endorsement. The majority in *Seyfried* held the action of the school superintendent was proper, reasoning: "We agree with the district court that those responsible for directing a school's educational program must be allowed to decide how its limited resources can best be used to achieve the goals of educating and socializing its students." (*Seyfried* v. *Walton, supra*, 668 F.2d at p. 217.) The court concluded there were sufficient burdens on school administrators, and courts should be reluctant to interfere with the operation of our school system. (*Ibid.*)[7]

The concurring opinion in *Seyfried* written by Judge Rosenn skillfully analyzes the balance between the right of students and teachers to free expression and the right of the school administration to control the school curriculum and environment. He noted the school superintendent did not object to the production of "Pippin" because of its ideas, but because of the explicit sexual overtones. In a comment particularly appropriate to the facts of this case, he observed: "School authorities should have more latitude in limiting the performance by their students in a school forum of a play which the authorities find vulgar and inappropriate because of sharp sexual overtones. Their acquiescence in such a performance might be construed as tacit approval of not only the performance but also the play's content." (*Seyfried* v. *Walton, supra,* 668 F.2d at p. 220, (conc. opn. of Rosenn, J.); see also *Bell* v. *U-32 Bd. of Educ.* (D.Vt. 1966) 630 F.Supp. 939.)[8]

Having examined the actions of the ECC officials in light of *Hazelwood,* I find they set no censorship policy and did not discipline either teacher or

[7] To the same effect, in *Epperson* v. *Arkansas, supra*, 393 U.S. at page 104 [21 L.Ed.2d at page 234], the United States Supreme Court stated: "By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional issues."

[8] The majority opinion also distinguishes *Seyfried* and *Bell* as being cases which deal with high schools and thus inapplicable to college settings.

students. It was the teacher who brought the play to the attention of the school officials and, in light of its content, its vulgarity, and its impact on the relationship of a community-based educational facility and the community it serves, the school officials made the decision not to produce it. To the extent their concerns regarding the play formed a part of the basis to cancel a class (along with 23 other classes) which had only three enrolled students, this was, in my view, a valid exercise of the discretion vested in them. There was, therefore, no violation of the First Amendment rights of either DiBona or Gundlach.

Finally, the majority opinion recognizes some authority in college officials to limit drama curriculum in light of school sponsorship and "literary" concerns, and that judgments made by those officials are entitled to broad deference if made in advance of the class rather than "as here, sometime after the class has already begun to meet." (Maj. opn., *ante*, pp. 1347-1348.)

The class in this case had not officially commenced, as witness the enrollment of only three students. The issues concerning the play were not known to the administration before the unofficial meetings of the class and the administrators acted immediately upon becoming aware of those issues. Respectfully, the majority's attempt to distinguish the facts of this case from those which recognize the authority of school administrators over curriculum content is a recognition of the weakness of its position. The majority's creation of a "post-commencement" limitation on curriculum control is not authorized by law and it is an unwarranted judicial intrusion upon the legitimate authority of a school to deal with the content of its curriculum. I would not impose such a rule.

### CONCLUSION

School administrators in facilities such as the one before us are charged with the responsibility to structure and maintain the curriculum and to husband the limited funds provided them to carry out their educational mission. Academic freedom in the form established by the majority opinion would actually give teachers free rein to cover whatever they want, regardless of content or its potential impact on the school.

Requiring a school to pay for, promote, and advertise within the community a particular play which contains considerable vulgarity and is offensive to the community during a highly charged and sensitive time is far different from prohibiting the several students in *Tinker* from wearing black armbands. I believe the United States Supreme Court has clearly placed significant curriculum and resource decisions in the hands of school adminis-

trators. The majority unfortunately has snatched that authority from their hands and given it over to individual faculty (regular or part-time) and students. All of this is done in pursuit of academic freedom.

Respectfully, the majority opinion will permit in matters of curriculum content the faculty tail to wag the administration dog. In my view, this sets a bad policy which I hope will not long endure.

Respondents' petition for review by the Supreme Court was denied July 25, 1990. Arabian, J., was of the opinion that the petition should be granted.